**In re GENCOR INDUSTRIES,
INC., Debtor.**

**Gencor Industries, Inc., Plaintiff,**

**v.**

**CMI Terex Corporation, Standard Havens Products, Inc., and Cedarapids, Inc., Defendants.**

**Bankruptcy No. 00–03597–6J1.
Adversary No. 02–00192.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

March 14, 2003.

Paul S. Singerman, Berger Davis & Singerman, P.A., Miami, FL, for debtor.

Jules S. Cohen, Akerman, Senterfitt & Eidson, P.A., Orlando, FL, for petitioning creditors.

## MEMORANDUM OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

KAREN S. JENNEMANN, Bankruptcy Judge.

This adversary proceeding came on for hearing on October 24, 2002, on cross motions for summary judgment, filed by the plaintiff, Gencor Industries, Inc. (Doc. No. 11), the debtor in this Chapter 11 case, and defendants, CMI Terex Corporation, Standard Havens Products, Inc., and Cedarapids, Inc (Doc. No. 10).[1] These motions raise two fundamental issues. First, whether a settlement agreement entered into by Standard[2] and Gencor was an executory contract within the meaning of 11 U.S.C. § 365.[3] Second, whether confirmation of Gencor's plan of reorganization discharged any claims the defendants should have asserted in Gencor's bankruptcy case.

The debtor's primary business is the manufacture of large road building plants. The defendants, competitors in the debtor's business, contracted with Gencor to provide consulting expertise in the development of a counter flow asphalt plant.[4] The defendants held a patent, the Hawkins Patent, for the technology used in the counter flow asphalt plant.

In exchange, Gencor agreed not to use or disseminate any invention or new information it learned during the consulting process. The defendants alleged that Gencor breached this agreement when Gencor marketed its own version of the counter flow asphalt plant called the Ultradrum. Ultimately, in 1988, the defendants insti-

1. The defendants are related corporations. Cedarapids owns or controls Standard Havens Products; CMI Terex is the sister corporation of Cedarapids.

2. Even though not all named defendants were parties to the settlement agreement, for ease of reference, all three defendants named in this adversary proceeding will be referred to herein collectively as defendants or Standard.

3. Unless otherwise stated, all references to the Bankruptcy Code refer to Title 11 of the United States Code.

4. A counter flow asphalt plant is one in which the stream of raw materials travels in a con-

current direction to the flow of hot gases used to heat and dry those materials in stage one of a manufacturing process. The concurrent flow prevents the hot gases from overheating or igniting the liquid asphalt and recycled asphalt which are added to the mixture during stage two of the process. By avoiding combustion of the stage two components, it is claimed that the counter flow plant produces a better product and reduces the health and safety risks associated with asphalt production. *Standard Havens Prod., Inc. v. Gencor Indus., Inc.,* 1989 U.S. Dist. LEXIS 2908 (W.D.Mo.1989).

tuted patent litigation against Gencor asserting that the design of the Ultradrum infringed upon the Hawkins Patent. *Standard Havens Prod., Inc. v. Gencor Indus., Inc* (Civil Action No. 88–1209, CV–W–3). At the time, the litigation was of great importance to Gencor as it related to Gencor's ability to continue manufacturing its primary product, the asphalt plant.

After six years of litigation, the parties reached a settlement on September 28, 1994, and signed a Mutual Release and Settlement Agreement (Doc. No. 11C, Ex. A). It is this settlement agreement that is in dispute in this adversary proceeding. Pursuant to the terms of the agreement, Gencor agreed to pay Standard $1,200,000 in consideration for an irrevocable license to use the Hawkins Patent,[5] and for the "release, covenant not to sue and forever discharge [Gencor]... from any and all claims... up to and including the date of [this] Mutual Release and Settlement Agreement, including without limitation claims for: patent infringement, patent misuse... or any other claim, known or unknown, which may exist at this time." (Doc. No. 11C, Ex. A, pgs. 6, 11). Additionally, Gencor agreed to pay Standard a per use royalty fee, capped at $30,000, for each new asphalt plant which utilized a process covered by the Hawkins Patent (Doc. No. 11C, Ex. A, pgs. 7–8). In exchange, Standard agreed to take all reasonable efforts to enforce the Hawkins Patent ("Patent Defense Clause") and to extend to Gencor any lower royalty or more favorable terms that it subsequently should offer to other persons or entities ("Most Favored Nations Clause") (Doc. No. 11C, Ex. A, p. 9). Additionally, the parties agreed to arbitrate any future claims arising out of the terms or perform-

ance of the settlement agreement and refrain from disclosing the terms of the agreement to third parties, with certain exceptions (Doc. No. 11C, Ex. A, p. 4, 11).

Gencor contends that it never utilized the Hawkins Patent because the company had developed its own alternative design long before the litigation with Standard ended (Doc. No. 11A, p. 3). Therefore, Gencor has never used the Hawkins Patent or paid Standard any royalty fees. In 1996, however, the defendants wrote to Gencor claiming that Gencor's alternative design relied upon the Hawkins Patent and demanded royalty payments due under the settlement agreement. Gencor disagreed. The parties exchanged blueprints and design documents. They met to confer on the design similarities and differences and continued to exchange correspondences.

On May 13, 1997, Gencor's patent counsel wrote the last letter between the parties further clarifying Gencor's position (Doc. No. 11B, Ex. A, p. 3). In the letter, counsel for Gencor explained again the design differences between Gencor's alleged new design and those encompassed by the Hawkins Patents in order to "assist [Standard's] understanding [of] the reasons why the current Ultradrum mixers do not infringe literally or by equivalents any of the claims of the Hawkins apparatus patent or the invalidated process patent." (Doc. No. 11B, Ex. A, p. 6). The letter also invited Standard to "visit ... Gencor's manufacturing facility to permit [Standard] to ensure that the drums are being built in accordance with the blue prints [Gencor provided]," if Standard believed any issues remained to be addressed (Doc. No. 11B, Ex. A, p. 6). The letter clearly shifted the burden on Standard to investi-

---

5. The irrevocable license covered several different patents held by Standard; however, for ease of reference, all the patents covered by the irrevocable license will be referred to herein collectively as the Hawkins Patents.

gate further if Standard believed Gencor had breached the settlement agreement. However, Standard never responded in any manner to this letter in May 1997. Gencor, therefore, asserts it reasonably assumed the matter was resolved.

Four years later, in April 2000, Gencor's creditors instituted an involuntary bankruptcy petition against Gencor, and, in September 2000, Gencor agreed to entry of an order for relief. Gencor did not list the settlement agreement as an executory contract or the defendants as creditors in their schedules. The Court established the bar date to file claims as January 22, 2001, and served official notices of the pendency of this Chapter 11 case and the bar date on Gencor's scheduled creditors and shareholders. Two of the defendants, Standard and Cedarapids, were not listed as creditors and did not receive any official notices regarding this case. CMI Terex Corporation, however, was a shareholder of Gencor. As such, one of the three defendants, CMI Terex Corporation, *did* receive actual notice of the bar date and all relevant material dates in this bankruptcy case. None of the defendants filed a proof of claim.

On December 20, 2001, an order confirming Gencor's plan of reorganization was entered (Doc. No. 772 in the main case). Upon confirmation, Gencor was revested with all its property. The confirmation order also included an injunction, the discharge injunction, barring any creditors from asserting a claim for debts that arose prior to the petition date.

The defendants sat silently for several months before again suing Gencor, in June 2002, in a patent infringement suit entitled *Standard Havens Prod., Inc. v. Gencor Indus., Inc* (Civil Action No. 02–558) filed in the United States District Court, District of Delaware. This litigation mirrored the claims asserted by the defendants in the original patent infringement litigation filed in 1988 (Doc. No. 11A, Ex. A). Gencor informed the defendants that any claims prior to January 1, 2002, were barred by the discharge injunction issued upon confirmation of Gencor's plan of reorganization. Also, Gencor argued that any patent infringement claims were precluded by the irrevocable license issued pursuant to the 1994 settlement agreement, and any royalty claim or other dispute arising out of the 1994 settlement agreement was subject to mandatory arbitration pursuant to the arbitration provision in the settlement agreement.

In response, the defendants filed and served an amended complaint on Gencor asserting claims arising after January 1, 2002 (Doc. No. 11A, Ex. B). The defendants further claimed that Gencor had rejected the 1994 settlement agreement because the settlement agreement was an executory contract that Gencor failed to assume during its Chapter 11 case. Standard argued that this alleged rejection terminated the 1994 settlement agreement, the related irrevocable license, and the arbitration clause, and, gave rise to the defendants' claims in the 2002 Delaware litigation.

Gencor then filed this adversary proceeding seeking, among other types of relief, a declaratory judgment that the 1994 settlement agreement was *not* an executory contract within the meaning of Section 365 of the Bankruptcy Code. The defendants filed an answer and sought a counter declaratory judgment on the same issue. Additionally, the defendants also sought a declaratory judgment that any claims held by the defendants against Gencor were *not* discharged upon confirmation of Gencor's plan of reorganization, because the defendants were known creditors of Gencor and did not receive actual notice of the bar date, violating their due process rights.

Gencor responded to the defendants' counterclaim by seeking a counter declaratory judgment on the discharge issue, arguing that the defendants were unknown creditors and were not entitled to receive actual notice of the bar date.

*THE MUTUAL RELEASE AND SETTLEMENT AGREEMENT IS NOT AN EXECUTORY CONTRACT WITHIN THE MEANING OF 11 U.S.C. § 365*

Gencor contends the settlement agreement is not an executory contract that required Gencor to assume its terms. Standard asserts the agreement is executory. Both parties agree in their cross motions for summary judgment, however, that there are no genuine issues of material fact relating to the issue of whether the settlement agreement is, or is not, an executory contract. Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [6] The moving party on a motion for summary judgment bears the burden of showing that there are no genuine issues of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). Here, both parties contend they are entitled to summary judgment based on the undisputed facts.

The determination of whether the settlement agreement and the related irrevocable license are executory, or not, is important to determine whether Standard can assert a claim against Gencor, or not, and, to determine which forum will resolve any claim sought by Standard. If the settlement agreement *is* an executory contract, Gencor rejected, or terminated, the agreement by not expressly assuming the agreement in Gencor's plan of reorganization. The defendants could have a claim against Gencor for breach of contract that this Court would resolve. On the other hand, if the settlement agreement is *not* an executory contract, Gencor could not have assumed or rejected the agreement in its plan of reorganization. The terms of the agreement remain enforceable. Gencor is entitled to use of the irrevocable license, if it chooses, and the defendants must seek arbitration for any disputes arising under the settlement agreement.

Gencor argues that the settlement agreement is not an executory contract because *neither* party has any remaining mutual, material obligations, which if unperformed, would constitute a material breach. Gencor contends that the settlement agreement was fully performed when both parties mutually released all claims against the other eight years ago, and the portion of the agreement relating to the irrevocable license was fully performed when Gencor paid for, and the defendants granted, the irrevocable license.

Gencor argues that *both* parties must have material unperformed obligations for the agreement to be executory within the meaning of Section 365. Gencor acknowledges that a licensee's duty to pay royalties is usually a material obligation; however, Gencor contends that the defendants do not have any remaining *material* unperformed obligations relating to the settlement agreement, or the irrevocable license. Gencor's obligation to pay royalties, if and when it utilizes the Hawkins Patent, cannot transform the agreement into an executory contract. Therefore, Gencor argues the agreement is not

---

**6.** Fed.R.Civ.P. 56(c). Federal Rule of Civil Procedure applies to bankruptcy cases pursuant to Federal Rule of Bankruptcy Procedure 7056.

executory because the defendants have no remaining obligations, which if unperformed, would cause a material breach.

Conversely, the defendants argue that they *do* have certain material obligations relating to the irrevocable license, which if unperformed, would cause a material breach. Standard argues that its covenant not to sue Gencor for infringement of the Hawkins Patent, standing alone, makes the agreement an executory contract. Standard contends that, by definition, a license is an agreement to forbear from suing the licensee for infringement. The covenant not to sue Gencor for infringement is the core purpose of the license agreement, and, if Standard sued Gencor, Standard would be in material breach of the agreement.

Standard additionally argues that, independent of the covenant not to sue, the Patent Defense Clause and Most Favored Nations Clause impose material obligations on Standard that are sufficient to render the agreement executory. Standard argues that, pursuant to the Patent Defense Clause, if the defendants do not enforce the Hawkins Patent against all infringers, the defendants would be in material breach of the agreement. Indeed, prior to acquiring CMI Terex, Standard brought patent infringement litigation against CMI Corporation on the very same patent licensed to Gencor, in part because of their obligation to enforce the Hawkins Patent. Additionally, Standard argues that, pursuant to the Most Favored Nations Clause, if the defendants do not notify Gencor of any lower royalty rates, the defendants would be in material breach of the agreement.

Gencor disagrees, arguing that the Most Favored Nations and Patent Defense Clauses do not impose *any* obligation upon the parties. Gencor contends that these clauses merely condition Gencor's duty to pay royalties, and the failure to fulfill a condition would not cause a breach of contract. The failure to fulfill a condition could only excuse the other party's performance. Gencor argues that, under the Patent Defense Clause, if the defendants fail to protect the Hawkins Patent, Gencor could use the patent at no cost, and, under the Most Favored Nations Clause, if the defendants offered another licensee a lower price, the defendants must offer the same price to Gencor. These clauses simply set the price that Gencor must pay if Gencor ever uses the license. Taken together, Gencor argues that the defendants no longer have any unperformed material obligations. The defendants fully performed its material obligation eight years ago when it granted Gencor the irrevocable license.

Pursuant to Section 365(a) of the Bankruptcy Code, a debtor may assume or reject the duties of an executory contract subject to the court's approval. The term "executory contract" is not defined in the Bankruptcy Code, but the legislative history of the section suggests a broad reading of the term. According to congressional reports, an executory contract generally includes contracts "on which performance remains due to some extent on both sides." H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6303; S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5844. The breadth of the definition suggested by the legislative history, however, may be overly broad, "since it is the rare agreement that does not involve unperformed obligations on either side." *In re Columbia Gas Sys., Inc.,* 50 F.3d 233, 238 (3rd Cir.1995)(quoting *Mitchell v. Streets (In re Streets & Beard Farm P'ship),* 882 F.2d 233, 235 (7th Cir. 1989)). Courts and commentators have struggled to more precisely formulate a

workable definition of "executory contract" in a bankruptcy context.

■ Section 365 was included in the Bankruptcy Code to give the debtor the option of assuming contracts where performance by the non-bankrupt party will benefit the estate, or, of rejecting contracts where further performance by the debtor will not benefit the estate. H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6303; S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5844. In bankruptcy, a debtor can escape the burden of an unprofitable contract by agreeing to pay specified rejection damages, or, a debtor can accept the benefit of a profitable contract by assuming the contract and fully performing.

■ Based on this purpose, one commentator characterized an executory contract as a combination of assets and liabilities held by the bankruptcy estate. *Columbia Gas*, at 238 (citing Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law*, 106–7 (1986)). If the package of assets and liabilities provide a net asset to the bankruptcy estate, the debtor will assume the contract. *Columbia Gas*, at 238. If the debtor assumes the executory contract, the debtor accepts the liabilities with the assets and must render at full value the bargained for performance. If the package of assets and liabilities does not provide a net asset to the bankruptcy estate, the debtor will reject the executory contract. *Id.* If the executory contract is rejected, the debtor no longer bears the obligation of further performance under the contract, but instead breaches the contract and incurs liability for that breach in the form of rejection damages assessed as a prepetition, unsecured claim for contract damages. *Columbia Gas*, at 238 (citing Thomas H. Jackson, *The Logic and Limits of Bank-*

*ruptcy Law*, 108 (1986); *In re Taylor*, 913 F.2d 102, 106–07 (3d Cir.1990); *University Medical Ctr. v. Sullivan (In re University Medical Ctr.)*, 973 F.2d 1065, 1078 (3d Cir.1992)).

In cases where the non-bankrupt party has fully performed, however, it makes no sense to talk about assumption or rejection. *Columbia Gas*, at 239. At that point, the debtor already has obtained the benefit of the non-bankrupt's performance under the agreement. *Id.* (citing Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law*, 106 (1986)). Assumption of the agreement will bring the debtor no new assets. Nor will rejection create any new liabilities because the non-bankrupt party already has a claim against the debtor's estate for the debtor's non-performance. Neither rejection nor assumption would benefit the estate. *Id.* (citing Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law*, 107 (1986)). Rejection of the contract in this context "is no different from abandoning property of the estate." *Columbia Gas*, at 239.

■ These considerations lead many courts, including this Court, to adopt the Countryman definition of "executory contract" for the purposes of Section 365. According to Professor Countryman, an executory contract is a "contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Vern Countryman, *Executory Contracts in Bankruptcy*, 57 Minn. L.Rev. 439, 460 (1973). Thus, unless both parties have unperformed obligations that would constitute a material breach if not performed, the contract is not executory. *Columbia Gas*, at 239.

Under the Countryman test, this Court must determine whether both Gencor and the defendants have obligations so far unperformed that the failure to perform would constitute a material breach. Gencor relies on three cases for the proposition that the remaining obligations in the settlement agreement are not material, and, that the agreement was fully performed eight years ago when the agreement was executed, and Gencor paid for and received the irrevocable license from the defendants. *In re Learning Publ'n, Inc.*, 94 B.R. 763 (Bankr.M.D.Fla.1988); *In re Stein and Day, Inc.*, 81 B.R. 263 (Bankr.S.D.N.Y.1988); *In re Qintex Entm't, Inc.*, 950 F.2d 1492 (9th Cir.1991).

In *Learning Publications* and *Stein*, both cases involved book contracts in which the author/licensor gave the debtor/licensee broad publishing and distribution rights, subject only to the licensee's duty to account and to pay royalties. *Learning Publ'n*, at 764; *Stein*, at 266. Both courts held that despite the licensee's continuing duty to pay royalties, the contracts were not executory because the authors did not owe any remaining material duties to the debtor. *Learning Publ'n*, at 765; *Stein*, at 267. The books were written, and the fact that the debtor has a continuing duty to pay royalties was not sufficient alone to transform a fully performed contract into an executory contract. *Id.*

In *Qintex*, the actors/licensors signed away all rights to their performance in four movie contracts. *In re Qintex Entm't, Inc.*, 950 F.2d 1492 (9th Cir.1991). The Ninth Circuit held that despite the licensee's continuing covenant not to sell any production rights to third parties, and, to indemnify the debtor for breaches and cooperate with the debtor in any joint defense, the four licensing contracts were not executory contracts. *Id.* at 1497. The

continuing obligations were immaterial. *Id.* The actors fully performed when they signed away all their rights to their performance. *Id.*

The defendants primarily rely on two cases for the proposition that the remaining obligations in the settlement agreement *are* material, and, if unperformed, would constitute a material breach. *Everex Sys., Inc. v. Cadtrak Corp.*, 89 F.3d 673 (9th Cir.1996); *Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043 (4th Cir.1985). In *Lubrizol*, the debtor, RMF, granted Lubrizol a nonexclusive license to utilize a certain metal coating process technology. *Lubrizol*, at 1045. The debtor sought to reject the license agreement in its Chapter 11 case, but Lubrizol objected, contending that the license agreement was not executory and could not be rejected. *Id.* The Fourth Circuit held that the license *was* an executory contract because the licensor had continuing direct duties to notify, defend, and indemnify the licensee against infringement suits. *Id.*

In *Everex Systems*, the debtor held a nonexclusive license to use certain computer graphics technology and wanted to assume and then assign the license agreement to a purchaser. *Everex*, at 674–75. The Ninth Circuit Court of Appeals held that the license was an executory contract because the licensor owed the continued performance of refraining from suing the licensee for infringement. *Id.* at 677. The Ninth Circuit Court of Appeals found this obligation to be material because a nonexclusive license is a "mere waiver of the right to sue the licensee for infringement." *Id.* (quoting *De Forest Radio Tel. Co. v. U.S.*, 273 U.S. 236, 242, 47 S.Ct. 366, 71 L.Ed. 625 (1927)).

■ After analyzing these cases, the Court finds that the obligations, declared material in *Lubrizol*, are inapplicable here,

and the defendants' reliance on *Everex* is misplaced. In *Lubrizol*, the debtor's material on-going obligations were unconditional obligations imposed on the licensor to notify, defend, and indemnify the licensee against infringement suits. Here, the defendants do not have flat, unconditional obligations. Rather, the obligations contained in the Most Favored Nations and Patent Defense Clauses act as mere conditions to payment, not unconditional obligations.

Basic contract law distinguishes between the failure of a condition, on the one hand, and a breach of an unconditional duty or obligation, on the other hand. Restatement (Second) of Contracts § 225(3) (1981). The failure to fulfill a condition would not cause a breach of contract, unless a party has an affirmative duty to insure that the condition occurs. Restatement (Second) of Contracts § 225(3) (1981); *Columbia Gas*, at 241 (citing *Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 61 N.Y.2d 106, 460 N.E.2d 1077, 1081-2, 472 N.Y.S.2d 592 (N.Y.1984) (citing Restatement (Second) of Contracts 225(3) (1981))). The failure of one party to fulfill a condition, merely excuses the performance of the other party. *Id.*

In *Columbia Gas*, the Third Circuit Court of Appeals held that a settlement agreement between Columbia Gas Transmission Corporation, a gas supplier, and its customers was not an executory contract. *Columbia Gas*, 50 F.3d 233. The court found that, although the agreement imposed continuing obligations on Columbia Gas, the non-bankrupt parties, Columbia's customers, had no similar obligations. *Id.* at 240-44. Specifically, the court found that the customers only had conditions to payment. *Id.* at 242-44. Under the settlement agreement, customers were entitled to receive a share of the settlement monies paid by Columbia Gas only after each customer executed a release of their claims and signed a supplemental contract. *Id.* at 236. Any customer who failed to execute these documents would not receive a share of the settlement fund; however the failure of any, or even all, of the individual customers to execute these documents would not result in a material breach of the settlement agreement. *Id.* at 242-44. The court found that the execution of the release/supplement contract was merely a condition to payment. *Id.* Therefore, because the customers had no duty to perform, only conditions to fulfill before receiving payment, the agreement was *not* executory as to both contracting parties. The agreement imposed duties only on Columbia Gas and was not executory within the meaning of Section 365(a).

Similarly, here, the defendants rely upon the Most Favored Nations Clause and the Patent Defense Clause to demonstrate that their agreement with Gencor is executory, but these provisions are all conditions of payment, *not* obligations, which, if unfulfilled, would cause a material breach. Under the Most Favored Nations Clause, if Standard licenses the Hawkins Patent to another entity at a lower royalty, or on more favorable terms, Standard must offer the same terms or rates to Gencor. Just as customers of Columbia Gas had to execute releases to receive payment, in order to get paid, Standard must offer Gencor reduced rates, if similar rates are offered to other users. As such, the Most Favored Nations Clause is a condition that could arise only upon Gencor's use of the license.

Likewise, under the Patent Defense Clause, the defendants agree "to take reasonable efforts in good faith to enforce the [Hawkins Patent]" as a "*condition* of Gencor's obligation for payment of royalties." (Doc. No. 11C Ex. A p. 9)(emphasis added). If Gencor were to use the license,

and if the defendants refused to defend the Hawkins Patent, Gencor would have no obligation to pay royalties to the defendants. Neither of these clauses contains obligations. They are mere conditions that arise only upon Gencor's use of the license. They are conditions to the defendants' right to payment, not obligations that if unperformed would result in a material breach of the agreement.

■ Additionally, the Court finds that the covenant not to sue, inherent in a licensing agreement, is not a material obligation. The defendants' reliance on *Everex* is misplaced. In *Everex*, the Ninth Circuit Court of Appeals, without discussion of the law or the facts, declared the covenant not to sue a material obligation, citing the United States Supreme Court decision in *De Forest Radio Telephone Co. v. United States. Everex Sys., Inc. v. Cadtrak Corp.*, 89 F.3d 673, 677 (9th Cir. 1996) (citing *De Forest Radio Tel. Co. v. U.S.*, 273 U.S. 236, 242, 47 S.Ct. 366, 71 L.Ed. 625 (1927)). However, *De Forest Radio* does not stand for the holding that the covenant not to sue, which is inherent in a licensing agreement, is a material, ongoing obligation. Rather, the Supreme Court held that, if a licensor sues a licensee, the licensee "can escape liability... for the use of [the licensor's] invention by showing that the use is within his license." *De Forest Radio*, at 242, 47 S.Ct. 366. The existence of the license prohibits the licensor from instituting a suit for infringement against the licensee. The grant of the license is the act that gives the licensee the right of use, within the parameters set forth in the license. However, if the licensee exceeds these parameters, and the licensor believes the licensee's use of the

patent is outside the scope of the license, the licensor can sue for just compensation. *Id.* The covenant not to sue, inherent in a licensing agreement, is not a material obligation imposed on the licensor. Rather, the clause provides a defense to the licensee if the licensee is sued for allegedly exceeding the scope of the license. The clause does not create an affirmative obligation on the licensor. Again, the provision is more like a condition than a duty.

In this case, the facts are more similar to the facts in *Learning Publications* and *Stein. In re Learning Publ'n, Inc.*, 94 B.R. 763 (Bankr.M.D.Fla.1988); *In re Stein and Day, Inc.*, 81 B.R. 263 (Bankr. S.D.N.Y.1988). In both cases, the licensor granted the licensee broad rights, similar to the broad rights granted to Gencor. Gencor paid $1,200,000 for use of the license in perpetuity. Additionally, in *Learning Publications* and *Stein*, the courts found that, although remaining obligations existed, these obligations were not sufficient alone to transform a fully performed contract into an executory contract.

Similarly, here, although remaining immaterial or conditional obligations may exist, there are no *material* obligations remaining to be performed under the settlement agreement. Both parties performed all material obligations when they executed the settlement agreement in 1994, Gencor paid $1,200,000, and Standard granted Gencor the irrevocable license. The obligations contained in Most Favored Nations Clause and the Patent Defense Clause are not obligations at all. They are instead, conditions to payment, similar to the customer's right to receive payment in *Columbia Gas*.[7]

---

7. The defendants also argue that, in addition to the obligations imposed by the covenant not to sue, the Patent Defense Clause, and the Most Favored Nations Clause, the defendants are obligated to comply with the confidentiality provision in the settlement agreement. The plaintiff disagrees with the defendants' characterization of the confidentiality provision as

After fulfilling all these material obligations under the settlement agreement in 1994, either party *could* have taken additional actions. However, neither party had a *duty* to take further action. Although Gencor could have used the Hawkins Patent, it had no obligation or duty to use the license. If Gencor does use the license, Gencor does owe the defendants royalties; however, a mere right to payment, alone, is not enough to make a contract executory. *Lubrizol,* at 1046. Indeed, the defendants claim that Gencor did use the Hawkins Patent and may have a claim against Gencor. The determination of the amount of this claim will rest on Standard's compliance with *conditions* imposed by the Most Favored Nations Clause and the Patent Defense Clause.

Because neither party had any on-going affirmative duty that would cause a material breach if unperformed, the Court finds that, on the date the order of relief was entered in this case, the settlement agreement and the related irrevocable license were not executory contracts within the meaning of Section 365 of the Bankruptcy Code. Therefore, Gencor's failure to assume the settlement agreement is irrelevant. Neither assumption nor rejection is possible. The terms and conditions of the settlement remain in effect. Gencor is entitled to utilize the Hawkins Patent, if it so desires, and account and pay

royalties to the defendants. In addition, the arbitration clause remains in effect. To the extent the defendants have a claim that survives the confirmation of Gencor's plan of reorganization, the parties must arbitrate these claims. Accordingly, the Court finds no factual disputes exist which preclude granting Gencor's motion for summary judgment, insofar as the Court specifically holds that the settlement agreement and related irrevocable license between Gencor and the defendants are not executory contracts. Conversely, the Court denies the defendants' motion for summary judgment on the same issue.

*SUMMARY JUDGMENT DENIED (EX-CEPT AS TO CMI TEREX) ON WHETHER DEFENDANTS' CLAIMS ARE DISCHARGED IN GENCOR'S BANKRUPTCY CASE*

The next issue is whether the defendants' asserted claims against Gencor arising under the settlement agreement survived after the entry of the discharge injunction. The defendants argue that Gencor knew the defendants held a claim against Gencor and failed to give them proper notice of the claims bar date, January 22, 2001. The defendants contend that Gencor could and should have known of the defendants' claim because of the protracted litigation between them lasting

---

a material obligation. The confidentiality provision was irrelevant to Gencor and was included in the settlement agreement at the defendants' insistence because the defendants hoped to negotiate similar licensing deals with other users and did not want Gencor's pricing to be public. Gencor argues that the provision is akin to the confidentiality provision in *In re Hamilton Roe Int'l, Inc.,* 162 B.R. 590 (Bankr.M.D.Fla.1993). In *Hamilton,* the debtor sold its stock to the plaintiff pursuant to a stock purchase agreement. *Id.* at 595–96. The bankruptcy court held that the stock purchase agreement was not an executory contract despite the existence of a

mutual covenant of confidentiality and a seller's covenant not to compete. *Id.* at 596. The court construed the confidentiality provision as imposing only a unilateral obligation on the seller because in practical terms the purchaser had nothing to gain by divulging confidential information to third parties. *Id.* at 594. The debtor fully performed when it sold its stock, and any remaining duties were immaterial to that purpose. Similarly here, the Court finds that the obligation of confidentiality was for the unilateral benefit of Standard, breach of which would not cause a material breach of the settlement agreement.

from 1988 to 1994. Further, the defendants argue that the defendants' correspondence with Gencor as recently as May 1997, regarding potential infringement claims, was sufficient to allow Gencor to know of the defendants' claims.

Gencor argues that the defendants are unknown creditors not entitled to notice of the claims bar date. Gencor contends that they could not reasonably be expected to recall a single demand letter written by the defendants four years previous, especially when Gencor promptly responded to the defendants' demands and heard nothing further from Standard. Moreover, Gencor argues that the defendants, as competitors in a small industry, had notice of the bankruptcy case and simply chose not to participate in the bankruptcy proceeding, waiting in ambush until six months after the debtor's plan was confirmed to assert their claim.

■ As to one defendant, CMI Terex Corporation, however, all parties agree actual notice of the claims bar date was received. CMI was a shareholder of Gencor. CMI was listed on Gencor's mailing matrix and received all relevant notices and deadlines in this case. CMI had sufficient notice and time to assert any claim it held in this case. CMI never filed a proof of claim. As such, the discharge injunction now bars CMI from asserting any claim. Accordingly, as to CMI Terex Corporation only, the Court grants Gencor's motion for summary judgment and holds that, to the extent CMI had any claim against Gencor arising prior to January 1, 2002, the claim is discharged.

As to the other two defendants, Standard Havens Products, Inc. and Cedarapids, Inc., the analysis is more complicated. Section 1141(d) provides for the discharge of any claim arising before the date the debtor's plan is confirmed. 11 U.S.C. § 1141(d). After confirmation, the reorganized debtor is liable to pay only those debts arising under the plan of reorganization and post-petition administrative claims. The purpose of Section 1141(d) is to allow the debtor to start over and become a productive member of society.

■ On its face, Section 1141(d)(1)(A) appears to provide for an unequivocal discharge; however, the due process rights [8] guaranteed by the Fifth Amendment limit the reach of the section. 11 U.S.C. § 1141(d)(1)(A). The minimal notice required by the Fifth Amendment before a creditor's rights are adversely affected is not rigidly defined but depends upon the circumstances of a case.

■ The most important factor in defining adequate notice for the purpose of satisfying due process in a bankruptcy context is the debtor's knowledge of the creditor's existence. Courts uniformly hold that, when the debtor knows of a creditor's claim, the debtor must give actual notice of the relevant dates to that creditor. *City of New York v. New York, New Haven & Hartford Railroad Co.*, 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953). General knowledge of the existence of a bankruptcy case is insufficient to satisfy the requirements of due process. *Id.*

The Eleventh Circuit Court of Appeals, in *Spring Valley*, adopted this rule and held that Section 1141 does not discharge the debt of a known creditor who failed to receive actual notice of the claims bar date as required by Bankruptcy Rule

---

**8.** *City of New York v. New York, New Haven & Hartford Railroad Co.*, 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953). Bankruptcy Rule 2002(a)(8) provides that creditors are entitled to at least twenty days notice of, among other things, the meeting of creditors, and the date fixed for the filing of claims against the bankruptcy estate.

2002(a)(8), even if the creditor had actual knowledge of the general existence of the bankruptcy proceeding. *In re Spring Valley Farms, Inc.*, 863 F.2d 832, 835 (11th Cir.1989). Therefore, in the Eleventh Circuit, a known creditor *must* receive actual notice of the claims bar date in order for the creditor's claim to be discharged upon confirmation. The only exception offered by the Eleventh Circuit Court of Appeals is in those circumstances where the creditor "had actual knowledge of the bar date itself rather than merely a general knowledge of the initiation of the bankruptcy proceedings." *Id.* at 835 n. 2.

The difficulty arises in defining how much notice *unknown* creditors must receive in order to meet the minimal due process threshold. A debtor obviously cannot schedule or give notice to a creditor that the debtor cannot identify and does not know exists. Courts have struggled to resolve the tension between giving unknown creditors adequate notice of the bankruptcy case and critical bar dates, and, the public policy favoring discharge of all claims against the debtor.

In a non-bankruptcy, trust case, the Supreme Court recognized the tension between satisfying due process and bringing finality to a settlement of trust accounts when determining whether publication notice to beneficiaries of the trust fund satisfied due process. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). In *Mullane*, a trust company, which had exclusive management and control over a common trust fund, petitioned for a judicial approval to settle the various trust accounts. *Id.* at 309, 70 S.Ct. 652. In the common trust, the trust company invested assets of numerous small trusts, the beneficiaries of which were residents and nonresidents of the New York State. *Id.* These beneficiaries received notice of the settlement via the trustee's publication of an announcement in a local newspaper. *Id.* The special guardian and attorney appointed for all persons, known or unknown, who might have an interest in the income of the common trust fund, objected to the notice as inadequate. *Id.* at 310, 70 S.Ct. 652.

As a threshold matter, the Supreme Court stated that the "fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, at 314, 70 S.Ct. 652 (citing *Milliken v. Meyer*, 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278 (1940); *Grannis v. Ordean*, 234 U.S. 385, 34 S.Ct. 779, 58 L.Ed. 1363 (1914); *Priest v. Las Vegas*, 232 U.S. 604, 34 S.Ct. 443, 58 L.Ed. 751, (1914); *Roller v. Holly*, 176 U.S. 398, 20 S.Ct. 410, 44 L.Ed. 520 (1900)). The notice must be of such a "nature as reasonably to convey the required information (citation omitted), and it must afford a reasonable time for those interested to make their appearance." *Mullane*, at 314, 70 S.Ct. 652 (citing *Grannis v. Ordean*, 234 U.S. 385, 34 S.Ct. 779, 58 L.Ed. 1363; *Roller v. Holly*, 176 U.S. 398, 20 S.Ct. 410, 44 L.Ed. 520). Therefore, "the reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected (citations omitted), or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes.... Thus... in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree fore-

closing their rights." *Mullane*, at 315–17, 70 S.Ct. 652 (citing *Cunnius v. Reading School District*, 198 U.S. 458, 25 S.Ct. 721, 49 L.Ed. 1125 (1905); *Blinn v. Nelson*, 222 U.S. 1, 32 S.Ct. 1, 56 L.Ed. 65 (1911)). Moreover, in the case of beneficiaries whose interests are either "conjectural or future," or, could have been "discovered upon investigation," but "[did] not in due course of business come to knowledge of the trustee," actual notice may be dispensed with altogether because a trustee need never engage in "impracticable and extended searches in the name of due process." *Mullane*, at 317–18, 70 S.Ct. 652. Applying this standard, the Supreme Court found that, as to unknown beneficiaries whose interests or addresses were unknown to the trustee, publication notice was sufficient to satisfy due process. As to the known and located beneficiaries, notice by publication was insufficient. *Mullane*, at 318, 70 S.Ct. 652. Actual notice was required.

At least one court in the Eleventh Circuit has addressed the difficulty of discharging debts of unknown creditors. *Charter Crude Oil v. Petroleos Mexicanos*, 125 B.R. 650 (M.D.Fla.1991). The United States District Court for the Middle District of Florida articulated the test to use in determining whether a creditor is known, and entitled to actual notice, or unknown, and entitled to constructive or publication notice only. In *Charter Oil*, the debtor and Pemex entered into a sales contract in 1981 for the purchase of crude oil. *Id.* at 653. Charter would buy crude oil from Pemex and later receive an invoice for the delivery. *Id.* In June 1982, Pemex reduced the price of crude oil by $4.00 per barrel, effective June 1, 1982. *Id.* Although the May 31–June 3 delivery invoice sent by Pemex to Charter did not reflect the price change, Charter paid an amount $1,589,304 less than the stated price on the invoice relying on the price reduction. *Id.*

On December 30, 1982, Pemex sent Charter a telex requesting payment of the full invoice amount. *Id.* Charter did not pay the difference, and Pemex took no further action until June 30, 1986, when Pemex filed a motion for enlargement of time to file its claim in Charter's bankruptcy case. *Id.*

Charter earlier had filed for relief under Chapter 11 on April 20, 1984, and did not list Pemex as a creditor. *Id.* As a result, Pemex did not receive actual notice of the claims bar date. However, Charter widely published notice of the claims bar date in the Wall Street Journal and in other newspapers. *Id.* The bankruptcy court held that Charter should have known of the existence of Pemex's claim and that Pemex should have received actual notice of the claims bar date. *Id.* at 654. Further, the bankruptcy court held that publication notice was insufficient in this case "where the bar date was publicized only once, and where Pemex, a foreign corporation, would not necessarily subscribe to the publications in which the notice appeared." *Id.*

The district court reversed the decision holding that the bankruptcy court erred as a matter of law when it found that Pemex was a known creditor. The district court further held that creditors holding "merely conceivable, conjectural, or speculative claims" are not entitled to receive actual notice in a bankruptcy case. *Id.* at 655 (citing *Tulsa Prof'l Collection Services, Inc. v. Pope*, 485 U.S. 478, 108 S.Ct. 1340, 1347, 99 L.Ed.2d 565 (1988)). Instead, they are treated as unknown creditors whose claims are not "reasonably ascertainable." *Id.* at 655; (citing *Tulsa*, 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565; *Matter of GAC Corp.*, 681 F.2d 1295 (11th Cir.1982)). Therefore, the district court remanded the issue back to the bankruptcy court to determine if Pemex was a known or unknown creditor and whether

the debtor made a reasonably diligent effort to find the claim and the creditor. *Id.* at 658. However, the district court failed to address whether publication notice was necessary to discharge the claims of unknown creditors, as required by the Supreme Court in *Mullane,* or whether the publication notice given by Charter was sufficient.

■■■ Applying this confusing line of cases to the facts of this case, the Court concludes that material factual disputes exist. The Court cannot determine whether the defendants were known or unknown creditors or whether Gencor made a reasonably diligent search to identify the defendants' claims. Nor can the Court assess whether, even if the defendants were unknown creditors, Gencor made any attempt to provide the required publication or constructive notice or whether the defendants had actual knowledge of the claims bar date. Given the fact that their sister corporation, CMI Terex, had knowledge of the claims bar date, it certainly is possible that these remaining two defendants also had notice. If there are genuine issues as to any material facts, summary judgment should not be granted. Therefore, the Court denies both parties' cross motions for summary judgment on the issue of whether the defendants' claims are subject to the discharge injunction.

To resolve the remaining issue raised in this adversary proceeding, the Court will conduct an evidentiary hearing to determine whether Gencor knew of the defendants' claim at the time Gencor completed its schedules, whether Gencor could have discovered the defendants' claim through a reasonably diligent search or whether Gencor could reasonably have believed that the defendants had abandoned its claim, and whether the defendants had actual knowledge of the claims bar date. If the defendants were unknown creditors with no knowledge of the claims bar date, the Court then will need to determine whether Gencor gave other constructive or publication notice to the defendants to protect the defendants' due process rights.

Further, in an attempt to facilitate a consensual resolution of this adversary proceeding and to hopefully prevent another six years of litigation between these same parties, by separate order, the Court is directing the parties to mediation, which must be completed by **April 30, 2003.** A pretrial conference is scheduled for **10:30 a.m. on May 22, 2003.** A separate order consistent with this memorandum opinion shall be entered.