**In re The PENN TRAFFIC COMPANY, et al., Debtors.**

**No. 03 B 22945(ASH).**

United States Bankruptcy Court, S.D. New York.

March 11, 2005.

---

Paul, Weiss, Rifkind, Wharton & Garrison LLP, By Kelley A. Cornish, Esq., Elizabeth McColm, Esq., Ross B. Rosenfelt, Esq., New York, for Debtors and Debtors in Possession.

Green & Seifter, Attorneys, PLLC, By Robert K. Weiler, Esq., Syracuse, NY, for COR Route 5 Company, LLC.

### DECISION DENYING MOTION TO REJECT PROJECT AGREEMENT

ADLAI S. HARDIN, JR., Bankruptcy Judge.

Before me is a motion under Section 365(a) of the Bankruptcy Code, 11 U.S.C. § 365(a), to reject a Project Agreement dated May 1, 2001, amended by Modification Number 1 dated November 12, 2001 between debtor The Penn Traffic Company Inc. ("debtor" or "Penn Traffic") and COR Route 5 Company, LLC ("COR") (as modified, the "Project Agreement"). Because the Project Agreement has been fully performed by COR, except as prevented by the debtor, it is not an executory contract within the meaning of Section 365(a) and therefore cannot be rejected under the Bankruptcy Code.

### Jurisdiction

This Court has jurisdiction over this proceeding under 28 U.S.C. §§ 1334(a) and 157(a) and the standing order of referral to Bankruptcy Judges signed by Acting Chief Judge Robert J. Ward on July 10, 1984. This is a core proceeding under 28 U.S.C. § 157(b).

### Background

Penn Traffic, together with its subsidiaries (collectively, the "Company"), is one of the leading food retailers in the United States, with annual revenues in fiscal 2003 of approximately $2.3 billion. As of the petition date the Company operated approximately 211 supermarkets located throughout six states under the trade names "Big Bear," "Big Bear Plus," "Bi-Lo," "P & C," and "Quality." In addition to its retail operations, the Company served as a wholesaler for approximately 80 licensed franchisees and 66 independent operators. It operated distribution facilities in New York and Pennsylvania, and owned and operated a bakery processing plant in Syracuse, New York.

Penn Traffic and certain of its wholly- and indirectly-owned subsidiaries filed voluntary petitions under Chapter 11 on May 30, 2003. The Notice for the debtor's mo-

tion to reject the Project Agreement is dated November 9, 2004.

COR is engaged in commercial real estate development.

The property which is the subject of this contested matter is a 70,000 square foot "state of the art" supermarket (the "Supermarket") and associated land located in a shopping center known as The Towne Center at Fayetteville (the "Towne Center") in Fayetteville, New York, an affluent suburb of Syracuse, New York. The Towne Center is a modern shopping complex comprising a number of separate stores aggregating approximately 600,000 square feet. The Supermarket is located on an irregularly shaped 7.2 acre parcel of land occupied by the Supermarket and adjacent parking lots (as defined in Section 1.21 of the Project Agreement, the "Penn Traffic Supermarket Parcel"). Because the Towne Center was constructed with a common architectural theme and common entrances, exits, parking facilities and pedestrian areas, the Penn Traffic Supermarket Parcel is incorporated in and not visually distinguishable from the remainder of the Towne Center.

The Towne Center was previously known as the Fayetteville Mall, which was an abandoned, 1970s style, deteriorated, indoor-enclosed mall. Penn Traffic owned certain land with a building that was formerly a Sears Store, which was adjacent to the Fayetteville Mall. The real property originally owned by Penn Traffic could not have been developed into a modern suburban supermarket that would have been part of the shopping center complex now known as the Towne Center without the inclusion of contiguous and connecting real property owned by COR.

Stated summarily, the purpose of the Project Agreement was to provide (i) for the exchange of parcels of land owned by COR and Penn Traffic, respectively ("swap parcels"), which swap was necessary in order to integrate the Supermarket into the Towne Center, (ii) site preparation and construction of the Supermarket, (iii) financing for the cost of construction of the Supermarket, (iv) reimbursement of the cost of construction, (v) conveyance of title to the Penn Traffic Supermarket Parcel from Penn Traffic to COR, and (vi) a lease of the Supermarket by COR as landlord to Penn Traffic as tenant. The salient provisions of the Project Agreement are the following:

- *Swap parcels.* To augment the land originally owned by Penn Traffic and to combine the Penn Traffic land as an integral part of the prospective Towne Center shopping complex, the Project Agreement called for COR to convey to Penn Traffic a segment of land referred to as "Developer's Swap Parcel" in exchange for a portion of the land owned by Penn Traffic referred to in the Project Agreement as "Owner's Swap Parcel." Since the Owner's Swap Parcel was larger than the Developer's Swap Parcel, the Project Agreement called for COR to pay Penn Traffic an amount ultimately calculated at $735,800 to conclude the swap. The 7.2 acre parcel containing the Supermarket and adjacent parking lots, referred to above and defined in the Project Agreement as the Penn Traffic Supermarket Parcel, consists of the land originally owned by Penn Traffic, augmented by the Developer's Swap Parcel and construction of the Supermarket and diminished by the Owner's Swap Parcel conveyed to COR. Since consummation of the swap in late 2001, title to the Penn Traffic Supermarket Parcel has been vested in Penn Traffic.

- *Demolition, site work, permits.* The Project Agreement called for COR to

perform all demolition and site work and obtain all necessary permits at COR's expense. COR asserts that its cost in fully performing these obligations amounted to approximately $1.2 million.

● **Construction.** Section 4.1 of the Project Agreement required COR to construct the Supermarket. Construction of the Supermarket was completed by COR in the summer of 2002, and Penn Traffic has been operating the Supermarket since then.

● **Construction costs.** The term "Construction Allowance" is defined in Section 1.8 of the Project Agreement as "the amount of $55.00 per square foot of the ground floor area of the Supermarket." Section 4.2 of the Project Agreement, entitled "Construction Allowance and Additional Construction Costs," states that ". . . Penn Traffic shall pay COR for the construction of the Supermarket." There appears to be no dispute that Penn Traffic advanced to COR the cost of construction of the Supermarket calculated in accordance with the "Construction Allowance" formula of $55 per square foot provided in Section 1.8 of the Project Agreement. The total amount so advanced was approximately $3.5 million.

● **Reimbursement of Construction Allowance.** Section 4.3 of the Project Agreement, as amended by Modification Number 1, provides as follows:

After Substantial Completion and opening of the Supermarket, and COR's receipt of permanent loan proceeds which are secured by the Lease to finance the cost of improvements located on the Penn Traffic Supermarket parcel, COR shall reimburse Penn Traffic the Construction Allowance.

● **Conveyance of title to the Penn Traffic Supermarket Parcel.** Section 4.4 of the Project Agreement, as amended by Modification Number 1, entitled "Conveyance of Penn Traffic Supermarket Parcel," provides in relevant part as follows: "Upon payment of the Construction Allowance by COR to Penn Traffic, Penn Traffic shall convey the fee simple title to the Penn Traffic Supermarket Parcel to COR for no additional consideration; further, . . . **[quoted immediately below].**"

● **Lease back to Penn Traffic.** The portion of the first sentence of Section 4.4 of the Project Agreement as amended, quoted immediately above, opined as indicated by ellipsis, provides as follows: "further, at that time, COR and Penn Traffic shall execute and deliver the Lease and a memorandum of the Lease for recording in the Onondaga County Clerk's Office." The "Lease" referred to in this provision is a lease of the Supermarket from COR to Penn Traffic. The form of the Lease required to be executed by the parties was annexed as an exhibit to the Project Agreement.

As of the filing date of Penn Traffic's Chapter 11 petition, COR had performed all of its obligations required to be performed under the Project Agreement except for reimbursement of the Construction Allowance under Section 4.3 and tender of the Lease under Section 4.4. By letter dated March 19, 2004 from COR to Penn Traffic (the "March 19 Letter"), COR completed performance of its final obligations under the Project Agreement by rendering reimbursement of the $3,518,500 Construction Allowance and the signed Lease called for by the Project Agreement. The March 19 Letter stated as follows:

[COR Letterhead]

March 19, 2004

Francis D. Price, Jr.

Vice President & General Manager

The Penn Traffic Company

1200 State Fair Boulevard

Syracuse, New York 13221–4737

RE: P.T. Fayetteville/Utica, LLC to COR Route 5 Company, LLC

Dear Mr. Price:

On behalf of COR Route 5 Company, LLC, I am writing to advise that we are prepared to purchase the P & C building and real property in Fayetteville and accept your lease of it as set forth in our Project Agreement dated May 1, 2001, as amended. Once we pay the sum of $3,518,500, P.T. Fayetteville/Utica, LLC will provide us with title to the property, along with the signed lease as set forth in Exhibit B of the Agreement.

We have funding available to close that contemplates a closing on or before the end of April, which I am of the understanding must be approved by the bankruptcy court, because of your Chapter 11 proceeding.

Please advise as to what the next step will be and what, if anything you need from us to close.

Very truly yours,

**COR ROUTE 5 COMPANY, LLC**

/s/ Louis P. Aiello

General Manager

It is not disputed that Penn Traffic declined to accept COR's tender of performance under the March 19 Letter. As noted above, the instant motion to reject the Project Agreement was filed by Penn Traffic in mid-November 2004.

---

**1.** Under Section 1107(a) a debtor in possession is invested with the rights of a Chapter

*Discussion*

Section 365(a) of the Bankruptcy Code provides that, with exceptions not relevant here, "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." [1]

■ It is well established that the decision whether to assume or reject an executory contract under Section 365(a) is a matter of business judgment to be exercised in the best interests of the debtor in possession and its creditors. COR does not contest this proposition. The debtor's decision to reject the Project Agreement, if found executory, appears to meet the low threshold of the business judgment test, in that the debtor has obtained an appraisal of the fair market value of the Penn Traffic Supermarket Parcel at $9.8 million, contrasted with the $3.5 million reimbursement of the Construction Allowance which triggers the debtor's contractual duty to convey title to the Penn Traffic Supermarket Parcel to COR.

Because the Bankruptcy Code does not define "executory contract," it has been left to the courts to determine the meaning of the term as a matter of bankruptcy law in the context of Section 365(a). Not surprisingly, the issue has generated differing views in differing factual contexts. Defining "executory" and determining its consequences present no difficulty in cases where the obligations on both sides remain wholly unperformed, as in a simple contract for the purchase and sale of property that has not yet closed, or where there is an ongoing exchange of mutual performance on both sides, as in a lease where the monthly rent is paid in exchange for that month's use of the premises, or a service

---

11 trustee, with exceptions not relevant here.

or supply contract where the provision of services or goods is offset by the contemporaneous obligation to pay for the services or goods provided. In all such cases, at any particular point in time the performances called for under the contract *to that point* are reciprocal and offsetting, and so also are the obligations remaining to be performed in the future. Problems arise where the contract calls for performances by the parties which are not coequal at any given point in time, such as an installment sales contract under which title does not pass until the last payment is made, or a construction agreement or some hybrid form of agreement calling for substantial and costly performance by one party before the other party must perform its part of the bargain, or where one party has tendered its full performance but full performance was prevented by the other party. Such cases call for analysis and consequences that take into account all relevant facts and applicable nonbankruptcy law in resolving the kinds of issues that arise in a motion to assume or reject under Section 365(a).

Both sides in this contested matter agree upon the standard interpretation of the meaning of "executory contract," as adopted by the majority of courts considering the issue. Thus, the debtor asserts in paragraph 12 at page 5 of its Motion to Reject that an executory contract " 'is a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other' " (quoting *Sharon Steel Corp. v. National Fuel Gas Dist. Corp.*, 872 F.2d 36, 39 (3d Cir.1989), which in turn was quoting from Countryman, *Executory Contract in Bankruptcy, Part I*, 57 MINN. L.REV. 439, 460 (1973)). Similarly, COR states at page 6 of its Memorandum in Opposition: "Under the classic definition of an 'executory contract' first suggested by Professor Vern Countryman and relied upon by most courts, an executory contract is an agreement that is not so fully performed that a breach by either side would constitute a material breach of contract" (citing *In re 375 Park Avenue Associates, Inc.*, 182 B.R. 690, 697 (Bankr.S.D.N.Y.1995), also citing to the same Countryman Law Review article).

Applying what may be referred to in colloquial shorthand as the "substantial performance" test espoused by both sides, it is clear that the Project Agreement was an executory contract upon the date of filing of the Penn Traffic Chapter 11 petition, because on that date, May 30, 2003, COR had not paid or tendered reimbursement of the $3.5 million required of it under Section 4.3 of the Project Agreement as a precondition of its right to conveyance to it of title to the Penn Traffic Supermarket Parcel.

It is equally clear that upon COR's tender of $3,518,500 and proffer of "the signed lease as set forth in Exhibit B of the Agreement" in the March 19 Letter, the Project Agreement was no longer executory, because the tender of payment required under Section 4.3 and proffer of the signed Lease as required under Section 4.4 constituted tender of full completion of all performance required of COR under the Project Agreement.

While the point is not addressed by the parties, the debtor's argument seems to be premised on the assumption that the "performance" required of COR in applying the "substantial performance" test includes COR's putative future performance as landlord under the Lease. However, the debtor's assumption (if such it is) simply ignores the facts. The contract which the debtor seeks to reject is the Project Agreement, not the Lease. To determine

the performance required of COR on this motion to reject the Project Agreement, one must examine the performance required of COR *under the Project Agreement.* The *only* obligation of COR with respect to the Lease provided under the Project Agreement is the obligation to sign and deliver the Lease. This obligation was fulfilled by the proffer in COR's March 19 Letter, except as prevented by the debtor. The putative obligation of future performance under the Lease is, or will be, a contractual obligation *under the Lease.* But the Court is not at liberty to rewrite the Project Agreement by reading into the Project Agreement an obligation contained not in that Agreement, but in a separate and different contract, the Lease.

■ The parties also have not addressed what I believe to be a central question here, which is whether the "substantial performance" test must be applied as of the date of filing the debtor's bankruptcy petition, or whether a later date, such as the date of filing the motion to reject, may be appropriate so that post-filing events may be considered. The debtor's motion simply assumes that the filing date is the deadline. Once again, the statute is silent as to the date for determining the executory status of a contract under Section 365(a), which necessarily leaves it to the courts to establish a rule or to make the determination on a case-by-case basis. And again, not surprisingly, the courts have given differing answers to the question in differing circumstances.

Many decisions have stated that "executoriness" is determined as of the filing date, often without analysis and without indicating whether the issue was contested or even whether it mattered.

Other courts have concluded in numerous cases that the date of filing is not the touchstone, and that when post-petition events occur which render the contract non-executory before the motion to assume or reject is filed or heard, those events should be considered and not simply ignored. *See, e.g., In re Balco Equities Ltd., Inc.,* 312 B.R. 734, 750 (Bankr.S.D.N.Y. 2004) ("[I]t is well settled that 'events after the filing of the bankruptcy petition may cause the contract to be regarded as not executory when the motion to assume or reject was made, such as contracts which expired post-petition by their own terms after the date of the petition but before the motion was heard.' "); *In re Riodizio, Inc.,* 204 B.R. 417, 421 (Bankr.S.D.N.Y.1997) ("Ordinarily, executoriness is determined as of the petition date. Sometimes, however, postpetition events alter the executoriness of a contract, as when a contract expires post-petition. In those circumstances, a court will look to the date the motion to assume or reject is made or heard rather than the petition date") (internal citations omitted); *In re Spectrum Information Technologies, Inc.,* 193 B.R. 400, 404 (Bankr.E.D.N.Y.1996) ("The significant date for determining whether a contract is executory is initially at the time when the petition is filed. However, 'events after the filing . . . may cause the contract to be regarded as not executory when the motion to assume or reject was made, such as contracts which expired post-petition by their own terms after the date of [filing] but before the motion was heard.' ") (internal citations omitted); *In re Wang Laboratories, Inc.,* 154 B.R. 389, 391 (Bankr.D.Mass.1993) ("[T]he determination of whether a contract is executory is to be made not at the time of filing, but at the time that the issue is before the Court"); *In re Broaddus Hospital Ass'n,* 159 B.R. 763, 771 (Bankr.N.D.W.Va.1993) (" 'The critical date for determining the executory nature of a contract is the date on which the bankruptcy court considers the debtor's application to assume or re-

ject the contract.'"); *In re Child World, Inc.*, 147 B.R. 847, 851–52 (Bankr.S.D.N.Y. 1992) ("In determining whether or not a contract is executory for purposes of assumption or rejection, consideration must be given first to the obligations of the parties at the time when the bankruptcy petition was filed rather than when the motion to assume or reject was made. However, events after the filing of the bankruptcy petition may cause the contract to be regarded as not executory when the motion to assume or reject was made, such as contracts which expired post-petition by their own terms after the date of the petition but before the motion was heard") (internal citations omitted); *In re B & K Hydraulic Co.*, 106 B.R. 131, 132 (Bankr.E.D.Mich.1989) ("There is a group of cases holding that when the time duration of an executory contract expires before the Court considers the issue of assumption or rejection, the issue is moot"); *In re Chas. P. Young Co.*, 111 B.R. 410, 413 (Bankr.S.D.N.Y.1990) ("Rejection of a collective bargaining agreement pursuant to § 1113(b) and (c) is a moot issue if the agreement expires by its own terms and before the bankruptcy court has a hearing on rejection"); *Gloria Mfg. Corp. v. Int'l Ladies' Garment Workers' Union*, 734 F.2d 1020, 1022 (4th Cir. 1984) ("If the critical date for determining the executory nature of the contract is the date on which the bankruptcy court granted the Union's motion for summary judgment, the bankruptcy[1] court was correct. Once a contract has expired on its own terms, there is nothing left for the trustee to reject or assume.... Because the contract expired before [the debtor] was able to obtain court approval for its attempt at rejection, the contract was no longer executory"); *In re Pesce Baking Co., Inc.*, 43 B.R. 949, 957 (Bankr.N.D.Ohio 1984) ("The critical date for determining the executory nature of a contract is the date on which

the bankruptcy court considers the debtor's application. Although a collective bargaining agreement may be executory on the date the debtor's bankruptcy petition is filed, once the agreement expires of its own terms, the debtor's application to reject it becomes moot") (internal citations omitted); *In re Gov't Securities Corp.*, 101 B.R. 343, 349 (Bankr.S.D.Fla.1989) (holding that the contract in question was not executory and thus not subject to the assume-or-reject election, "[t]he critical date for determining the executory nature of a contract is the date on which the bankruptcy court considers the debtor's application to assume or reject the contract. Although a contract may be executory on the date the bankruptcy petition is filed, circumstances may arise which render the contract no longer executory") (internal citations omitted); *In re Total Transportation Service, Inc.*, 37 B.R. 904, 906 (Bankr. S.D.Ohio 1984) (refusing to accept the debtor's contention that executoriness is determined as of the petition date and observing that in the case relied on by the debtor for that proposition there was no "change in debtor's situation pre- or post-filing").

Lacking any controlling authority from the Court of Appeals for the Second Circuit, I conclude that post-petition events should be considered among the other facts hearing on the question of executoriness when a motion to assume or reject is filed.

In this case there is no principled reason for declaring retrospectively that the date of Penn Traffic's bankruptcy filing was the deadline for COR to have fulfilled the balance of its obligations under the Project Agreement if it wanted to preserve its rights thereunder. There is no such deadline in the Project Agreement itself. Nor is there any statutory basis for the Court to create such a limitation. Penn Traffic's

bankruptcy filing did not terminate the Project Agreement, or COR's obligation to perform under Section 4.3, or COR's right to perform and concomitant entitlement under Section 4.4, or Penn Traffic's rights and concomitant obligations under those Sections. COR was never in default under the Project Agreement, although Penn Traffic clearly breached the Agreement by refusing to perform under Section 4.4 after the March 19 Letter.

■ It is well settled that the mere filing of a bankruptcy petition does not enhance a debtor's contract rights or diminish its obligations. *In re M.J. & K Co., Inc.,* 161 B.R. 586, 593 (Bankr.S.D.N.Y. 1993) ("The filing of a petition under the Code does not expand those rights [under a license agreement at issue]"); *In re Nemko, Inc.,* 143 B.R. 980, 987 (Bankr. E.D.N.Y.1992) ("This contractual right is not affected by the filing of a Chapter 11 petition. The rights of a debtor to the property of the estate do not expand when the debtor files a petition in bankruptcy"); *In re Anne Cara Oil Co., Inc.,* 32 B.R. 643, 647 (Bankr.D.Mass.1983) ("The [Bankruptcy] Code does not ... grant the debtor ... greater rights and powers under the contract than he had outside of bankruptcy. [There is] nothing in the Code which enlarges the rights of [the debtor] under the contract or which prevents the termination of the contract on its own terms ...") (citing *In re Nashville White Trucks, Inc.,* 5 B.R. 112, 117 (Bankr.M.D.Tenn.1980)); *Aetna Casualty & Surety Co. v. Gamel,* 45 B.R. 345, 349 (N.D.N.Y.1984) (same); *In re Heaven Sent, Ltd.,* 37 B.R. 597, 598 (Bankr.E.D.Pa.1984) (same); *Valley Forge Plaza Assocs. v. Schwartz,* 114 B.R. 60, 62 (E.D.Pa.1990) ("A debtor in bankruptcy has no greater rights or powers under a contract than the debtor would have outside of bankruptcy"); *Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1213 (7th Cir.1984),

*cert denied,* 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 ("The filing of the Chapter 11 petition cannot expand debtors' rights as against [the counter-contracting party, the franchisor]"); *In re Sanders,* 969 F.2d 591, 593 (7th Cir.1992) ("Filing a bankruptcy petition does not expand or change a debtor's interest in an asset ..."); *In re ANR Advance Transp. Co.,* 247 B.R. 771, 774 (Bankr.E.D.Wis.2000) (same); *In re Gull Air, Inc.,* 890 F.2d 1255, 1261 (1st Cir. 1989) ("The Bankruptcy Code does not create or enhance property rights of a debtor"); *In re Island Helicopters, Inc.,* 211 B.R. 453, 464 (Bankr.E.D.N.Y.1997) ("The filing of a bankruptcy petition does not 'expand the debtor's rights against others more than they exist at the commencement of the case'"); *In re B & K. Hydraulic Co.,* 1991 WL 93191, at *2, 1991 U.S.App. LEXIS 12127, at *4 (6th Cir. Jun. 4, 1991) ("The trustee fares no better under the executory contract and automatic stay provisions of the Bankruptcy Code. . . . [C]ontracts of insurance that are simply allowed to expire by their own terms during the contract period, like other contracts, do not create further duties of performance and are not characterized as 'executory' for purposes of [11 U.S.C. § 365]").

■ That a bankruptcy filing has no effect on contract rights and obligations is reflected in the settled law that contracts which are neither assumed nor rejected are deemed to "pass through" the bankruptcy unaffected by the filing. *See, e.g., Texaco Inc. v. Bd. of Cmmrs. for the La-Fourche Basin Levee District, et al.,* 254 B.R. 536, 557 (Bankr.S.D.N.Y.2000); *In re Shoppers Paradise,* 8 B.R. 271 (Bankr. S.D.N.Y.1980) (Schwartzberg, J.) ("Until assumed or rejected, an executory contract or unexpired lease remains in force and if neither assumed nor rejected, passes with other property of the debtor

to the reorganized corporation"); *In re Matter of Greystone III Joint Venture,* 995 F.2d 1274, 1281 (5th Cir.1991) (if a debtor neither assumes nor rejects an executory contract, the contract continues in effect), *In re Cochise College Park, Inc.,* 703 F.2d 1339, 1352 (9th Cir.1983) ("Until rejection, however, the executory contract continues in effect and the non-bankrupt party to the executory contract is not a creditor with a provable claim against the bankrupt estate"); *Boland v. Parmelee,* 1997 WL 642550 (N.D.N.Y.1997) ("The effect of neither accepting nor rejecting an executory contract is that the contract remains in force") (citing *In re Yonkers Hamilton Sanitarium,* 22 B.R. 427 (Bankr.S.D.N.Y.1982) and *In re Shoppers Paradise, supra* ); *In re Cajun Elec. Power Co-op. Inc.,* 230 B.R. 715, 734 (Bankr. M.D.La.1999) (executory contracts which are neither assumed nor rejected during a Chapter 11 proceeding flow through the proceeding "without alteration"), *In re Polysat, Inc.,* 152 B.R. 886, 891 (Bankr. E.D.Pa.1993) (lease which was neither assumed nor rejected "passed through the chapter 11 case unaffected by bankruptcy"); *In re Nevada Emergency Services, Inc.,* 39 B.R. 859, 861 n. 1 (Bankr.D.Nev. 1984) ("[C]ase law developed under past and current law supports the conclusion that such contracts pass through the reorganization proceedings unaffected and become an obligation of the reorganized debtor"). *See also N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 546 n. 12, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (Brennan, J., concurring and dissenting) ("In the unlikely event that the contract is neither accepted nor rejected, it will 'ride through' the bankruptcy proceeding and be binding on the debtor even after a discharge is granted.... The nondebtor party's claim will therefore survive the bankruptcy proceeding"). "A finding that an unassumed and unrejected executory contract passes

through the bankruptcy proceeding and remains in effect is in keeping with Chapter 11's policy of allowing the trustee freedom to run the business without having to obtain court approval at every step." *In re DeVlieg, Inc.,* 1993 WL 248205 at *3 (N.D.Ill.1993).

The relevant principle to be distilled from these two uniform lines of bankruptcy authority is that the mere filing of a bankruptcy case has no effect on contracts, and thus the date of filing has no contractual significance. That principle cannot logically coexist with a judge-made rule that would fix the date of a bankruptcy filing as a cutoff date for determining contract status (executory or not), thereby affecting important contract rights under Section 365(a) in a manner that ignores the facts and is contrary to contract law. The principle that a bankruptcy filing has no effect on contracts cannot be reconciled with a rule requiring courts to ignore postfiling events in order to permit a debtor to reject a contract that is in fact and law not executory when the motion to assume or reject is filed.

COR had no control over Penn Traffic's decision to file, or the date of filing, no right to advance knowledge of the filing, and thus no ability to protect its contract rights from being cut off by rejection under a brightline rule declaring that executoriness is fixed as of the filing date. The Bankruptcy Code in Section 365(d)(2) grants the debtor the right to assume or reject at any time prior to confirmation, and the debtor has the power to move promptly after filing its petition to reject any contract that is then executory if it chooses to do so. But the Code does not grant the debtor the right to breach its contract by refusing a contractually timely post-filing tender of performance that rendered the contract non-executory, and

thereafter move to reject the contract as executory due solely to its own breach.

■ That is this Court's conclusion. COR's March 19 Letter was timely under the Project Agreement. The March 19 Letter constituted a valid tender of full performance of COR's two remaining obligations under the Project Agreement—reimbursement of the $3.5 million Construction Allowance and a signed and delivered Lease. That was the undisputed state of facts at the time the debtor filed its motion to reject the Project Agreement in mid-November 2004, some nine months after full performance was tendered. The fact that COR's tender of full performance was never consummated by reason of the debtor's refusal to accept performance obviously cannot nullify the fact that COR fully performed its obligation other than as prevented by the debtor itself. It is elementary that a party may not deprive another of contractual rights by virtue of its own breach.

■ The Supreme Court restated this venerable and still universally accepted principle of contract law in *R.H. Stearns Co. v. United States*, 291 U.S. 54, 61, 54 S.Ct. 325, 78 L.Ed. 647 (1934):

The applicable principle is fundamental and unquestioned. "He who prevents a thing from being done may not avail himself of the nonperformance which he has himself occasioned, for the law says to him, in effect: 'This is your own act, and therefore you are not damnified'" (citing *Dolan v. Rodgers*, 149 N.Y. 489, 491, 44 N.E. 167 (N.Y.1896)).

For the sake of brevity, this fundamental principle may be conveniently referred to as the "Doctrine of Prevention of Performance." The effect of the Doctrine is that a contracting party may not claim that the counterparty's non-performance was a breach excusing its own obligation when performance was tendered by the counter-party but wrongfully rejected by the contracting party. The Second Circuit Court of Appeals, the New York Court of Appeals and many other courts have restated the Doctrine in countless contexts. *See, e.g., Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 501 (2d Cir.1989) ("It is true that a condition precedent may be excused if the party whose performance is predicated on that condition somehow blocks its occurrence. 'It is well settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself'") (citing *Young v. Hunter*, 6 N.Y. 203, 207 (N.Y.1852)); *A H.A. General Construction, Inc. v. New York City Housing Authority*, 92 N.Y.2d 20, 31, 677 N.Y.S.2d 9, 699 N.E.2d 368 (N.Y.1998) ("A condition precedent is linked to the implied obligation of a party not to 'do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract'"); *Kirke La Shelle Co. v. The Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163 (N.Y.1933) (noting the principle which provides that "in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract"); *Kooleraire Serv. & Installation Corp. v. Bd. of Educ.*, 28 N.Y.2d 101, 106, 320 N.Y.S.2d 46, 268 N.E.2d 782 (N.Y.1971) ("The general rule is … that a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition"); *Arc Elec. Constr. Co. v. George A. Fuller Co.*, 24 N.Y.2d 99, 104, 299 N.Y.S.2d 129, 247 N.E.2d 111 (N.Y.1969) (a party cannot "rely on [a] condition precedent … where the non-performance of the condition was caused or consented to by itself"); *Stern v. Gepo Realty Corp.*,

289 N.Y. 274, 277, 45 N.E.2d 440 (N.Y. 1942) ("An allegation, therefore, that title did not close because of the vendor's neglect and refusal to discharge liens against the property is sufficient to avoid the defense of non-performance of a condition precedent, the performance of which he himself has rendered impossible"); *Amies v. Wesnofske*, 255 N.Y. 156, 162–63, 174 N.E. 436 (N.Y.1931) ("If a promisor himself is the cause of the failure of performance of a condition upon which his own liability depends, he cannot take advantage of the failure." "It is a well-settled and salutary rule that a party cannot insist upon a condition precedent, when its nonperformance has been caused by himself") (internal citations omitted); *Patterson v. Meyerhofer*, 204 N.Y. 96, 100–101, 97 N.E. 472 (N.Y.1912) ("In the case of every contract there is an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part. This proposition necessarily follows from the general rule that a party who causes or sanctions the breach of an agreement is thereby precluded from recovering damages for its non-performance or from interposing it as a defense to an action upon the contract"); *Vandegrift v. The Cowles Engineering Co.*, 161 N.Y. 435, 443, 55 N.E. 941 (N.Y.1900) ("[I]f the impossibility [of performance] arises, directly or even indirectly from the acts of the promisee, it is a sufficient excuse for non-performance. This is upon the principle that he who prevents a thing may not avail himself of the non-performance which he has occasioned"); *Lager Assocs. v. City of New York*, 304 A.D.2d 718, 759 N.Y.S.2d 116 (N.Y.App.Div.2003) (noting "a party to a contract cannot rely on the failure of another to perform a condition precedent where the party has frustrated or prevented the occurrence of the condition"); *Rochester Community In-dividual Practice Association v. Finger Lakes Health Ins. Co., Inc.*, 281 A.D.2d 977, 722 N.Y.S.2d 663 (N.Y.App.Div.2001) (" 'A condition precedent is linked to the implied obligation of a party not to "do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" ' "); *Pitts v. Davey*, 40 Misc. 96, 81 N.Y.S. 264 (N.Y.Sup.Ct.1903) ("A plaintiff cannot recover in an action against another for breach of contract . . . if it appears that he, directly or indirectly, prevented the other party from performing, and the default of the other party is primarily due to the act or neglect on plaintiff, then no recovery can be had, but the party prevented from performing in full may recover *pro rata*. Otherwise[,] the plaintiff would recover the damages flowing from his own acts") (emphasis in the original), *120 Greenwich Dev't Assocs., LLC v. Reliance Ins Co.*, 2004 WL 1277998, at *9, 2004 U.S. Dist. LEXIS 10514, at *25–26 (S.D.N.Y. Jun. 8, 2004) ("It is well established that 'a party who actively interferes with the performance of a contract may not then recover damages or benefits by its own actions' ") The Doctrine is articulated in RESTATEMENT (FIRST) OF CONTRACTS § 295 (1932) as follows:

> § 295 Excuse Of Condition By Prevention Or Hindrance
>
> If a promisor prevents or hinders the occurrence of a condition, or the performance of a return promise, and the condition would have occurred or the performance of the return promise been rendered except for such prevention or hindrance, the condition is excused, and the actual or threatened nonperformance of the return promise does not discharge the promisor's duty, unless
>
> (a) the prevention or hindrance by the promisor is caused or justified by

the conduct or pecuniary circumstances of the other party, or

(b) the terms of the contract are such that the risk of such prevention or hindrance as occurs is assumed by the other party.

Returning to the Countryman definition of an executory contract employed by almost all courts, and espoused by both parties here, it is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Applying this formulation to the facts, COR tendered full performance of all its obligations under the Project Agreement in the March 19 Letter. As a matter of law, specifically the Doctrine of Prevention of Performance, COR's failure to complete performance did not "constitute a material breach excusing performance of" Penn Traffic, because COR's inability to complete its performance was due solely to breach by Penn Traffic and did not constitute a breach by COR. Thus, as a matter of fact and law it cannot be said that COR's obligations under the Project Agreement were "so far unperformed" that its failure to complete its performance tendered in the March 19 Letter constituted a "material breach excusing performance" by Penn Traffic.

The debtor cites three cases that reach the opposite conclusion as to the effect of a tender of full performance, *Benevides v. Alexander (In re Alexander)*, 670 F.2d 885 (9th Cir.1982) and two cases which rely on the *Alexander* decision. *In re Dunes Casino Hotel*, 63 B.R. 939 (D.N.J.1986) and *In re RLR Celestial Homes, Inc.*, 108 B.R. 36 (Bankr.S.D.N.Y.1989). In *Alexander* the debtor contracted to sell her house to plaintiffs. On the closing date plaintiffs had the necessary funds and "tendered full performance," but the debtor "refused to convey title or surrender possession." 670 F.2d at 886. The plaintiffs brought an action for specific performance in state court, and on the day scheduled for trial the debtor filed her petition for bankruptcy under Chapter 13, staying the state court action. The debtor's Chapter 13 plan, which was ultimately confirmed by the bankruptcy court, stated that the debtor elected to reject her contract with the plaintiffs. Plaintiffs then commenced an adversary proceeding in the bankruptcy court seeking relief from the stay of their state court action. The bankruptcy court concluded that " 'when performance has been tendered as it has here by plaintiff, the contract is no longer executory in the bankruptcy sense that permits rejection by the debtor.' " *Id.* The district court affirmed. The Court of Appeals reversed, reasoning as follows:

> The agreement remains substantially unperformed: plaintiff still had to pay the remainder of the purchase price, and defendant had to give up possession and convey title. *Undoubtedly the contract remained so far unperformed that failure of either side to complete performance by conveying title or paying the purchase price would have constituted a material breach.*
>
> The contract did not cease to be executory when there was a tender of performance. Performance or the rendering of performance, not just tender of performance, is required.

*Id.* at 887 (emphasis supplied). In *Dunes* it was the seller who tendered a deed, which was rejected by the purchaser-debtor. Although it appears that the tender of title may not have constituted full performance, it is fair to say that *Dunes* agreed with and followed the Ninth Circuit's holding in *Alexander* The facts in *Celestial Homes* are murky, at best, but Judge

Schwartzberg's conclusion is substantially the same as that of the Ninth Circuit in *Alexander*.

This Court is unable to agree with the analysis and conclusion reached by the Circuit Court in *Alexander* and its progeny. My disagreement stems from the fact that none of these decisions applies or makes any reference to the fundamental legal principle referred in caselaw and here as the Doctrine of Prevention of Performance. The error in the Ninth Circuit's analysis in *Alexander* appears in the italicized sentence quoted above—"[u]ndoubtedly the contract remained so far unperformed that failure of either side to complete performance by conveying title or paying the purchase price would have constituted a material breach." In point of fact, plaintiffs did tender complete performance when they proffered the full purchase price on the closing date; as a matter of law, to wit, the Doctrine of Prevention of Performance, the plaintiffs' failure to actually pay the purchase price did *not* constitute a breach by plaintiffs and did not excuse the debtor's obligation to perform, because the failure to pay was due solely to the debtor's own breach of the agreement.

Nothing in Professor Countryman's definition suggests that the court should ignore either the actual facts before it or the governing principles of contract law in applying the Countryman definition of "executory contract." The analysis and conclusion of the Ninth Circuit in *Alexander* can only be reached by ignoring the fact of the purchasers' tender of full payment and the debtor's refusal to accept it and convey title, and the legal effect under the Doctrine of Prevention of Performance of that tender and refusal.

 The Ninth Circuit in *Alexander* states that "[t]here is no need to look at state law for the meaning of 'executory

contract.'" *Id.* at 888. This statement is accurate to the limited extent that the selection of a definition of executoriness is a question of federal law. But the Countryman definition *requires* the court to make a determination of whether the obligation of the non-debtor is "so far unperformed" that the non-debtor's failure "to complete performance would constitute a material breach excusing performance of" the debtor, in a factual matrix where the non-debtor has tendered full performance but was prevented from completing it due to the debtor's own breach. That determination *is* a question of law, and the court *must* look to state law to make that determination. The Ninth Circuit itself has explicitly acknowledged this in footnote 4 of a decision rendered one year after the *Alexander* decision:

> Although whether a given contract is "executory" under the Bankruptcy Act is an issue of federal law to be resolved under the *Select–a–Seat* test [citing the *Alexander* decision], the question of the legal consequences of one party's failure to perform its remaining obligations under a contract is an issue of state contract law. While the principles of contract law do not differ greatly from one jurisdiction to another, to the extent that they do, a bankruptcy court should determine whether one of the parties' failures to perform its remaining obligations would give rise to a "material breach" excusing performance by other party under the contract law applicable to the contract under the choice of law rules of the state in which the court sits.

*In re Cochise College Park, Inc.*, 703 F.2d at 1348 n. 4. *See also, Terrell v. Albaugh (In re Terrell)*, 892 F.2d 469, 471–72 (6th Cir.1989) ("We believe the Ninth Circuit has formulated a useful and workable answer to this question [*i.e.*, 'the extent to which state law governs the definition of

executory contracts']," referring specifically to and then quoting footnote 4 in *In re Cochise College Park, Inc.*); *In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 239 n. 10 (3d Cir.1995) ("In order to determine whether failure to perform the remaining obligations would constitute a material breach, we need to consider contract principles under the relevant nonbankruptcy law"); *Mitchell v. Streets (In re Streets & Beard Farm Partnership)*, 882 F.2d 233, 235 (7th Cir.1989) ("In determining the significance of the remaining obligations under a contract we look to relevant state law"); *In the Matter of C & S Grain Co., Inc.*, 47 F.3d 233, 237 (7th Cir.1995) ("The extent of a party's obligations after another party repudiates its own obligations is a matter of state law"), *In re Bradlees Stores, Inc.*, 2001 WL 1112308, at *7, 2001 U.S. Dist. LEXIS 14755, at *24 (S.D.N.Y. Sept. 20, 2001) ("To determine if failure of performance would constitute a material breach, courts look to state contract law"); *In re Teligent, Inc.*, 268 B.R. 723, 730 (Bankr.S.D.N.Y.2001) ("The materiality of the breach under the Countryman Test is a factual question resolved through the application of state law"); *In re Riodizio, Inc.*, 204 B.R. at 421 ("The materiality of the breach is a question of state law"); *In re Tait Carson*, 286 B.R. 645, 649 (Bankr. E.D.Tenn.2002) (same, quoting *In re Terrell*); *In re Fitch*, 174 B.R. 96, 101 (Bankr. S.D.Ill.1994) ("Determination of the significance of the remaining obligations is made by looking to state law, as state law controls with regard to property rights in assets of a debtor's estate"); *In the Matter of Wall Tire Distributors, Inc.*, 110 B.R. 614, 617 (Bankr.M.D.Ga.1990) ("Whether the Agreement is executory under section 365(a) is a question of federal law. State law, however, determines whether the failure to perform a remaining obligation is a material breach of the contract"). Congress could perhaps have provided in the Bankruptcy Code a definition of "executory contract" in conflict with applicable state law, or otherwise required the courts to ignore or deviate from state law in resolving issues under Section 365(a). But it did not do so.

### *Conclusion*

The Project Agreement is governed by New York law (Section 10.6 of the Project Agreement). The Doctrine of Prevention of Performance has long been applied by both state and federal courts in New York as a part of the contract law of New York. Applying the New York Doctrine of Prevention of Performance to the undisputed facts in this case compels the conclusion that the Project Agreement was not an executory contract within the generally accepted Countryman definition of that term. For this reason the debtor's motion to reject the Project Agreement under Section 365(a) must be denied.

Counsel for COR will promptly settle an order in conformity with this decision.