**In re MICKEY'S ENTERPRISES, INC., Debtor.**

**MICKEY'S ENTERPRISES, INC., Plaintiff,**

v.

**SATURDAY SALES, INC., Defendant.**

**Bankruptcy No. 90–13417FM.
Adv. No. 92–1301FM.**

United States Bankruptcy Court,
W.D. Texas,
Austin Division.

Feb. 25, 1994.

Pamela D. Nielson, Sheinfeld, Maley & Kay, Austin, TX, for Mickey's Enterprises, Inc.

B. Weldon Ponder, Jr., Austin, TX, for Saturday Sales, Inc.

## MEMORANDUM OPINION ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

FRANK R. MONROE, Bankruptcy Judge.

On December 21, 1993, the Court held a hearing on the Plaintiff's Motion for Partial Summary Judgment and the Defendant's Motion for Summary Judgment in this adversary proceeding which is a core proceeding under 28 U.S.C. § 157(b)(2)(F) and (L) as it deals with the recovery of alleged preferential transfers and the effect of the Order confirming the Debtor's plan of reorganization. As such, it is a matter which arises under Title 11. Therefore, this Court has the jurisdiction to enter a final order disposing of the merits of this matter pursuant to 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 151, 28 U.S.C. § 157(a) and (b)(1) and the standing Order of Reference existing in this District. Pursuant to Bankruptcy Rule 7056 this Memorandum Opinion shall constitute a statement of non-contested material facts and Conclusions of Law made therefrom upon which the ruling of the Court is based.

### Undisputed Facts

The Debtor, Mickey's Enterprises, Inc., owned and operated a number of convenience stores in and around Killeen, Texas. Saturday Sales, Inc., the Defendant, supplied gasoline to the stores. After several years of buying and selling gasoline on open account, the parties entered into a Fuel Marketing Agreement ("Agreement") on February 24, 1989. The Agreement permitted the Debtor to purchase gasoline at a volume discounted price. The Agreement also provided for ten day credit terms, a $100,000.00 line of credit, and automatic termination of the credit terms in the event of default and failure to remedy the same after one day's notice.

Even though the Debtor *never* purchased the volume of fuel required under the Agreement to obtain the maximum discount available (four and three-quarters cents per gallon), the maximum discount was always credited to the Debtor by the Defendant.

In 1990, problems arose when the Debtor exceeded the $100,000.00 credit line and several of its checks were returned unpaid for insufficient funds. As a result, the Defendant rescinded the ten day credit terms provided for under the Agreement. The Defendant, however, continued to sell gasoline to the Debtor at the discounted price until confirmation of the Debtor's Plan when the Debtor rejected the Agreement and entered into a new supply agreement with an unrelated third party.

As of August 14, 1990 (the date the Debtor alleges the credit terms under the Agreement were rescinded), the Debtor had an outstanding accounts payable balance to the Defendant of $78,125.80. The Defendant demanded that the Debtor pay these outstanding invoices; and it did. Some were under ten days old when paid and some were over ten days old when paid. However, since these payments were made after the Defendant's rescission of the Agreement's ten day credit terms and were not contemporaneous with any purchase of gasoline, they are alleged by the Debtor to be preferential.

On October 29, 1990, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtor listed the Defendant in its Schedules as an unsecured creditor with a claim in the amount of $1,205.39. Even so, the Debtor designated the Defendant's claim as "unliquidated".

However, the Debtor designated *every one* of its secured, priority and general unsecured creditors as having "unliquidated" claims even though precise, "to the penny" amounts were set forth for each creditor. Further, the Debtor failed to disclose any where in its sworn Statement of Affairs *any* "preferential" prepetition payments to the Defendant. It listed only eleven payments on an unrelated secured equipment purchase note. The only reference to any possible preferential payments was in Schedule B–3, Property Not Otherwise Scheduled, under the heading "Property transferred under assignment for benefit of creditors within 120 days prior to filing of petition"; and, there the Debtor only referred to an "Involuntary reduction in line of credit" by the Defendant without disclosure of any specific alleged preferential payments or any other details.

The Debtor's First Amended Disclosure Statement ("Disclosure Statement") was approved by the Court on February 12, 1992. On April 21, 1992, the Court confirmed the Debtor's Second Amended Plan of Reorganization. Both the Disclosure Statement and Plan contained only a general retention clause with regard to preferences.[1] No specific reference to any possible preference action against the Defendant, or anybody else, was disclosed.

The Plan provided for payment of 25% of the amount of each general unsecured claim against the Debtor, including that of the Defendant. In addition, the Plan provided a deadline of sixty (60) days from the date of confirmation for the filing of administrative

claims and a deadline of ninety (90) days from the Effective Date for the filing of damage claims resulting from rejected leases and other executory contracts (see Plan at pages 6 and 12). The Defendant did not file a proof of claim in the case. It possibly could have filed both pre-petition and administrative unsecured claims for recovery of the discount it had given the Debtor under the Fuel Marketing Agreement both pre- and post-petition which the Debtor had not earned. It clearly could have filed an unsecured claim for damages from the rejection of the Agreement by the Debtor. But, it did not.

On September 23, 1992, after the bar dates for filing claims, the Debtor filed this adversary proceeding against the Defendant to recover the amount of $76,923.03 (the $78,125.80 balance due on August 14, 1990, less the amount due as per the schedules of $1,205.39) plus costs and attorneys' fees.

The Defendant filed an answer which, among other things, alleged the affirmative defenses that the alleged preferential payments were made in the ordinary course of business and that their recovery is barred by res judicata.

### Conclusions of Law

■ 1. *Plaintiff's Motion for Partial Summary Judgment.* The Defendant asserts that the payments complained of were made in the ordinary course of business under 11 U.S.C. § 547(c)(2).

The Debtor alleges that the Defendant terminated the credit terms authorized by

---

1. The Disclosure Statement contained the following provisions in relevant part:

    (1) "[a]ll causes of action (with the exception of any Causes of Action against Glenfed which are released) are preserved and retained for enforcement by the Reorganized Debtor whether or not commenced prior to the Effective Date. The Causes of Action retained include, without limitation: ... (ii) all preference claims pursuant to Section 547 of the Bankruptcy Code ...".
First Amended Disclosure Statement, paragraph 5.4.2;

    (2) "[a]s an additional source of money to be distributed to general unsecured creditors and to supplement the Debtor's cash flow, the Debtor will undertake to research and identify certain causes of action available to the Debtor

pursuant to the Debtor's avoidance powers created by the Bankruptcy Code."
First Amended Disclosure Statement, paragraph 4.2; and,

    (3) "[t]he Debtor's analysis does not include a valuation of any possible avoidance actions available pursuant to the Bankruptcy Code. As it does not appear that any liquidating trustee would have any unencumbered funds to use to prosecute avoidance actions, it is doubtful that any such actions could be brought. The uncertainty of liability and collectibility of such claims makes any valuation thereof speculative.... In any event, these causes of action are not thought to have any significant value for unsecured creditors in a liquidation."
First Amended Disclosure Statement, paragraph 4.3.

the Agreement within 90 days of the petition date and that such adjustment makes all subsequent payments on the then existing account balance not in the ordinary course of the business between the parties. The Debtor further states that prior to that date it typically paid for gasoline purchases by check whereas after that date it was required to pay for all purchases with cash or by cashier's check.

The defendant disputes these allegations. It maintains that the credit arrangement was terminated in July 1990, outside the preference period. Prior to that date it states that purchases were made by combinations of company checks, money orders and cashier's checks. After termination, future purchases were handled on a "cash after delivery" basis with purchase paid later that day, shortly thereafter, or even several days later.

These are disputed facts which go to the heart of both the existence of preferential transfers and the applicability of the ordinary course of business exception. As such the Court must deny the Plaintiff's Motion for Partial Summary Judgment. These disputed facts do not, however, preclude a dispositive ruling on the issues of res judicata and equitable estoppel as they are not material to those issues.

2. *Res Judicata.* Both parties seek summary judgment on the issue of res judicata. The Defendant alleges that the confirmation of the Debtor's Plan is dispositive of the Debtor's claim. It cites as authority for its position the Fifth Circuit case of *Eubanks v. Federal Deposit Insurance Corp.,* 977 F.2d 166 (5th Cir.1992). The Debtor counters that since the Plan did not specifically treat the Defendant's claim, res judicata is not available as a defense and *Eubanks* is distinguishable.

The doctrine of res judicata is a four-pronged test. The Fifth Circuit has said that for res judicata to apply,

"(1) the parties must be identical in the two actions; (2) the prior judgment must have been rendered by a court of competent jurisdiction; (3) there must be a final judgment on the merits; and, (4) the same

cause of action must be involved in both cases."

*Eubanks,* 977 F.2d 166, at 169.

In this case, as in *Eubanks,* the first three requirements are clearly been met. The fourth is the real dispute.

■ To determine whether the causes of action involved in both cases are the same the Fifth Circuit adopted a "transactional test", i.e. are the two actions based on the "same nucleus of operative facts"? *Eubanks,* 977 F.2d 166, at 171.

In *Eubanks* the reorganized Debtor and his wife filed a lender liability suit against two banks post-confirmation of their plan. The Fifth Circuit, applying the "transactional test", concluded that the same cause of action was involved in the confirmation of the debtors' plan and in the debtors' subsequent lender liability suit stating that, "the loan transaction at the heart of the instant litigation was also the source of First City's claim against Dr. Eubanks' estate, a claim which was uncontested and fully allowed as one of the provisions of the Plan." *Eubanks,* 977 F.2d at 172.

Here the analysis yields the same result. Both the Debtor's preference claim against the Defendant and the Defendant's scheduled claim against the Debtor arose from the prepetition purchase by the Debtor of gasoline from the Defendant under their then existing and continuing business relationship. They both arise from the same nucleus of operative facts.

■ The Debtor, however, claims that the Defendant did not have a claim that was treated under the Plan and, therefore, *Eubanks* does not apply. That is an argument that simply does not have merit. Even though the Defendant had failed to file a proof of claim or to request the allowance of any administrative claim as of the date of confirmation of the Debtor's Plan, it was still within the time period provided by the plan for such claims to be filed. Further, the Debtor had scheduled the Defendant with a small unsecured claim. It is true that the Debtor denoted the claim as "unliquidated", which under Bankruptcy Rule 3003(b)(1) would have normally required the Defendant

to file a proof of claim in order to participate; but, since the Debtor classified *all* of its scheduled claims as "unliquidated" even though "to the penny" amounts therefor were listed, the Debtor's denotation of the Defendant's claim on its schedules will be disregarded and given no effect. "Unliquidated" means "not ascertained in amount; not determined; remaining unassessed or unsettled, as unliquidated damages." Henry Campbell Black, *Black's Law Dictionary*, p. 1378 (5th ed. 1979). As the Debtor scheduled not only this Defendant's claim but all other creditors with "to the penny" claim amounts; they can hardly be considered as unliquidated. The Debtor apparently agrees because it has actually treated the Defendant's scheduled claim as allowed and made distributions on it under its Plan. Therefore, the Defendant will be deemed, as a matter of law, as having an allowed unsecured claim against the Debtor on the date of the hearing on confirmation of the Debtor's Plan in the amount as scheduled by the Debtor for which claim specific treatment (partial payment) is provided by the Plan. However, that does not end the inquiry.

The *Eubanks* case further determined that "even where there is an identity of claims, the doctrine of res judicata does not bar the second action unless the plaintiff could or should have brought its claim in the former proceeding." *Eubanks*, 977 F.2d at 173.

■ Thus, the inquiry here, as in *Eubanks*, becomes whether the Debtor *could or should have* raised its claim in the context of the confirmation proceedings.

The *Eubanks* decision is in large part based upon the equitable considerations that the debtors knew about their claim against the banks prior to the commencement of the confirmation proceedings, they failed to disclose it to creditors or to the Court and, they *could* have brought their action on the "occasion of its prior adjudication", i.e. at confirmation, but did not. Instead, they chose to treat the banks' claims as allowable for plan confirmation purposes and then, later on, institute litigation on their claim.

Here, our Debtor has acted no differently. It knew about its preference claim early on, long prior to the commencement of the con-

firmation proceedings. It chose, however, to veil its existence from the creditors and the Court. It *could* have openly and specifically called its preference claim to the attention of creditors and the Court both in its Statement of Affairs and in its Disclosure Statement; but it did not. It could have declared its opposition to the participation of the Defendant in its Plan; but it did not. This Court firmly believes it *should* have.

As of the hearing on confirmation, the Defendant still had all of its rights intact. It was still within the bar date to file proofs of claim. The Plan rejected the Agreement between the parties. It still had time to file a claim for damages resulting from that rejection. The uncontradicted summary judgment evidence establishes that the Defendant decided not to file any claims since no claims were disclosed against it by the Debtor. Under the circumstances it was willing to simply walk away. It would not have been willing to do so, however, had it known of the Debtor's preference claim and its intentions to pursue the same.

■ In order to confirm a plan the court must find that the plan and its proponent have complied with the applicable provisions of Title 11. See, 11 U.S.C. § 1129(a)(1) and (2). One of those applicable provisions is § 1125 which requires disclosure of "adequate information". See, 11 U.S.C. § 1125(a)(1). Under these circumstances, the Defendant was entitled to adequate information of what the Debtor's Plan provided *with regard to it* so it could make an informed decision as to how to react to the Debtor's Plan.

The Debtor's Disclosure Statement contained only a general retention clause which failed to specifically identify any § 547 causes of action. The instant cause of action was not disclosed. The Debtor's Disclosure Statement is misleading to this Defendant, to this Court, and to all creditors. The clear impression one gets from reading the Disclosure Statement is that the Debtor is downplaying the potential for preferential recoveries either as a significant asset or as a significant source of recovery. Indeed, none are identified as existing.

A disclosure statement, to be adequate, should disclose all litigation likely to arise in a non-bankruptcy context. *Westland Oil Development Corp. v. MCorp Management Solutions, Inc. v. Federal Deposit Insurance Corp.*, 157 B.R. 100, 102 (S.D.Tex. 1993) citing, *In re Metrocraft Pub. Services, Inc.*, 39 B.R. 567 (Bankr.N.D.Ga.1984). Bankruptcy related litigation which is likely to arise should also be specifically disclosed. And, clearly, any bankruptcy litigation that the plan proponent is planning on bringing against a known creditor with known claims who has a right to be involved in the confirmation process and who can still timely file claims should be fully disclosed.

As the Court in *Westland* said, "[t]he code requires adequate disclosure, not *selective* disclosure." (emphasis added). *Westland*, 157 B.R. at 103.

In *Westland* the Court barred the Debtor's claim against the creditor where the Debtor had failed to fully disclose its claim using the doctrine of res judicata. The Court reasoned that confirmation of the plan had the effect of a final judgment as the two suits arose out of the same transaction. Because the Debtor failed to raise all remedial rights or claims against the creditor prior to confirmation, the Debtor was precluded from asserting such claims thereafter. *Westland*, 157 B.R. at 103. Not only did this Debtor fail to "raise" any claims against the Defendant, it failed to disclose any.

This does not mean that a debtor, as a general rule, must litigate and resolve all § 547 causes of action prior to confirmation or be forever barred. What it does mean, however, is that a debtor "must *disclose* those claims that are likely" (emphasis added). *Id.*, at 103. In other words, the disclosure statement must give those creditors holding allowed claims who are entitled to participate (vote and object) in the confirmation process adequate notice of and information regarding the claims that the debtor as reorganized will be bringing against them under the plan. Failure to do so should generally result in the debtor being barred under the doctrine of res judicata from pursuing its claim in the future.

This Debtor provided information that was inadequate and/or misleading under 11 U.S.C. § 1125(a). It knew about the preference claim against the Defendant long prior to the Disclosure Statement being prepared. The nucleus of operative facts out of which both the Defendant's and the Debtor's claims arose was, in fact, a precipitating factor behind the Debtor's Chapter 11 filing. However, the Debtor lay behind the proverbial log until this creditor's remedies were exhausted and then, and only then, did it come forward with its claim. Res judicata bars the Plaintiff's claim.

3. *Equitable Estoppel.* The Defendant also asserts that the Debtor's preference claim is barred under the doctrine of equitable estoppel.

The Fifth Circuit has stated that equitable estoppel requires,

"(1) a material misrepresentation (or concealment), (2) made with actual or constructive knowledge of the true facts, (3) with intent that the misrepresentation be acted upon by (4) a party without true knowledge or means of knowledge of the true facts, (5) who detrimentally relies or acts on the misrepresentation." (citation omitted).

*Neiman–Marcus Group, Inc. v. Dworkin*, 919 F.2d 368 (5th Cir.1990).

Under the facts of this case all the required elements for equitable estoppel have been met. The Debtor effectively concealed the existence of, and its intentions with regard to pursuit of, a significant preference action against its sole supplier of gasoline that it knew it would be pursuing post-confirmation against this Defendant. The Defendant had no such knowledge. As the Debtor's true intention and the cause of action were concealed from it, the Defendant did not pursue the claims that it had against the Debtor. Had the Defendant known of the Debtor's true intention, the Defendant would not have simply walked away. It would have filed all its claims against the Debtor, something it cannot now do. This Court is firmly convinced by the evidence before it that the Debtor fully intended the Defendant to rely on its Disclosure Statement. This Debtor lay behind the log wait-

ing for the right moment to spring its trap. This Court will not allow it to do so now that all of the Defendant's rights are gone since they are gone due to the Debtor's concealment of its true intentions in violation of its disclosure duties under 11 U.S.C. § 1125. Equitable estoppel bars the Plaintiff's claim.

An Order of even date herewith will issue denying the Plaintiff's Motion for Partial Summary Judgment and granting the Defendant's Motion for Summary Judgment.