In re VALUE MUSIC CONCEPTS, INC.,
Central South Music Sales, Inc., Kar,
Inc., Records Central, Inc., and Music
4 Less, Inc., Debtors.

William Kaye, as Creditor Representa-
tive for Value Music Concepts,
Inc., et al., Plaintiff,

v.

A.R.E. Distribution & Alpine Records,
LLC; Atlanta International Record
Company, Inc.; Bookworld Christian,
Inc.; Compendia Media Group Corpo-
ration; Word Entertainment, Inc.;
Provident Music Distribution, Inc.;
Juanita Bynum Ministries, Inc.; and
New Day Christian Distributors, Inc.,
Defendants.

Bankruptcy No. 03–61285.
Adversary Nos. 04–06194, 04–06195,
04–06199, 04–06205, 04–06207, 04–
06208, 04–06210, 04–06223.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Aug. 22, 2005.

**113**

---

James R. Sacca, Greenberg Traurig, LLP, Atlanta, GA, for Plaintiff.

Catherine A. Harrison, Miller & Martin PLLC, Atlanta, GA, for Defendants.

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

PAUL W. BONAPFEL, Bankruptcy Judge.

The Plaintiff seeks to recover alleged preferential transfers from the Defendants for the benefit of unsecured creditors in his capacity as the Creditor Representative appointed pursuant to 11 U.S.C. § 1123(b)(3) under the confirmed chapter 11 plan of the Debtors, Value Music Concepts, Inc. ("Value Music") and its four subsidiaries. The alleged transfers arise out of transactions summarized as follows.

The Debtors had certain claims against the previous owners of the subsidiaries and the previous owners' companies. In satisfaction of these claims, the previous owners and their companies assumed and paid certain obligations of the Debtors, including debts to the Defendants. All of the debts except that of New Day Christian Distributors, Inc. ("New Day") were assumed under a Settlement Agreement that the Debtors entered into with the previous owners and their companies two weeks before the chapter 11 filings; the New Day assumption occurred about two months earlier. The Creditor Representative contends that the assumption and payment of the debts owed to the Defendants instead of payment of cash to the Debtors constituted transfers of the Debtors' property that are avoidable as preferences under 11 U.S.C. § 547(b).

The Defendants raise two defenses in their motions for summary judgment. The first is that the Creditor Representative cannot bring these actions because the plan did not specifically identify the Defendants or explicitly describe these actions so as to preserve the alleged transfers as postconfirmation claims for prosecution. Without such specificity, the Defendants argue, the plan did not expressly reserve these preference actions from the *res judicata* effect of the confirmation order; alternatively, they argue that the plan did not expressly identify the actions, as § 1123(b)(3) requires, for the Creditor Representative to have authority to bring them. Second, the Defendants other than New Day assert that the Creditor Representative cannot recover the payments as preferential transfers because they were made under the Settlement Agreement that is an assumed executory contract under 11 U.S.C. § 365.

The Court concludes that the plan's description of avoidance actions, including preference claims, as the type or category of causes of action of the estates to be retained and prosecuted by the Creditor Representative is sufficient to expressly reserve them from any possible *res judicata* effect of the confirmation order and to expressly identify them for postconfirmation prosecution under § 1123(b)(3) by the Creditor Representative. Furthermore, the Court concludes that the Settlement Agreement was not an executory contract; therefore, the fact that assumption and payment may have been made pursuant to it does not provide a defense to the prefer-

ence actions. Thus, the Court denies the motions for summary judgment.

## I. FACTS

On September 13, 2002 (four and a half months before the chapter 11 filings on January 27, 2003), Value Music acquired four subsidiaries, Central South Music Sales, Inc., KAR, Inc., Records Central, Inc., and Music 4 Less, Inc. (the "Debtor Subsidiaries") from their former owners, Randall Davidson, Greg Davidson, and others (the "Central South Shareholders"). The Central South Shareholders received 50 percent of Value Music's stock and controlled half of its board of directors. After the transaction, the Davidsons became officers and directors of Value Music.

The Central South Shareholders continued to own and operate Central South Christian Distributors, Inc., Central South Gospel, Inc., and Central South Distribution, Inc. (the "Central South Companies"). The Debtors and the Central South Companies were all engaged in the wholesale and retail distribution of music and related products.

In connection with the acquisition, Value Music agreed to sell to the Central South Companies, at cost, certain inventory that the Debtors had purchased from the Defendants and perhaps others.[1] The purchase price was to be paid in cash or, if the Debtors consented, by assumption of the Debtors' debts to the vendors who had sold it. One half was paid in cash, and the balance was due by December 12.

A dispute arose over a $3.6 million understatement of the amount of payables owed by the Debtor Subsidiaries at the time Value Music acquired them. Value Music claimed that the Central South Shareholders were liable for the understatement as a breach of warranties and representations in the acquisition agreement. Value Music excluded the Davidsons from any positions of operational control (apparently under pressure from its secured lender, which was threatening declaration of default due to the additional payables) and cut their salaries in half. In November the parties began negotiations with regard to resolution of their disputes.

In the meantime, the Central South Companies assumed and paid about $83,000 of payables (including $39,809 owed to New Day)[2] as partial payment for the inventory purchase. They also requested that Value Music permit the Central South Companies to pay the remaining purchase price by assumption of debts to certain vendors, which also sold to the Central South Companies. Value Music denied this request and demanded cash. The Central South Companies declined to pay cash unless it was earmarked to pay the vendors. As these events were occurring, Value Music decided not to pay rent and property taxes due under a warehouse lease that Value Music had executed in connection with the acquisition with a partnership comprised of some of the Central South Shareholders.

On January 10, 2003, the parties entered into a Settlement Agreement[3] that resolved all disputes. The Central South Shareholders relinquished their stock in Value Music and resigned as officers and directors. (Settlement Agreement ¶¶ 3, 8). With regard to reduction of the Davidsons' salary and employment termination, the Settlement Agreement provided that Randall Davidson's salary through Janu-

---

1. Complaints (except No. 04–06223) ¶ 6, Exhibit A; G. Davidson Declaration ¶ 14, Exhibit 2.

2. Complaint, No. 04–06223, ¶ 5, Exhibit A.

3. Complaints (except No. 04–06223) ¶ 10, Exhibit B; G. Davidson Declaration ¶ 27, Exhibit 3.

ary 10, 2003, would be restored to its original level and paid through January 10, and that he would receive salary at the one-half rate from January 10 through February 28. Greg Davidson's salary was not restored, and he was to continue to receive salary through January 31. On the date salary ended, each would "automatically cease to be an employee." (Settlement Agreement, ¶¶ 1, 2).

The Debtors' claim for the balance of the inventory purchase price was resolved by the assumption by the Central South Companies and three of the Central South Shareholders of the Debtors' obligations to the vendors which had sold the inventory to the Debtors. (Settlement Agreement ¶ 6 and Schedule 6). These Central South parties also agreed to assume an additional $750,000 of the Debtors' accounts payable. (Settlement Agreement ¶ 10 and Schedules 6, 10(b)). The Central South Companies thus assumed a total of $1,343,454.92 in payables, of which $821,677 was due to the seven Defendants other than New Day, which had been paid earlier.[4] In addition, certain of the Central South Shareholders who had guaranteed a November 2002 loan from Union Planters' Bank to a Debtor Subsidiary agreed to assume and pay it. (Settlement Agreement ¶ 6).

With regard to the warehouse lease, the agreement provided for its automatic termination on January 31, 2003, and the Debtors' payment, in full satisfaction of their lease obligations, of 75 percent of the rent for the period from September 13, 2002, through January 31, 2003, and all real property taxes due. A related sublease was also terminated. (Settlement Agreement ¶¶ 4, 5).

The Settlement Agreement also dealt with certain assets. The Central South Companies retained an aircraft that they had leased from a Debtor Subsidiary the day before the acquisition, when the Central South Shareholders had owned the subsidiary. The Settlement Agreement modified the lease to provide that the Central South Companies would pay rent of $1.00 per month and, as additional rent, all amounts due on a loan secured by the aircraft payable to SouthTrust Bank. (Settlement Agreement ¶ 9). Similarly, the Settlement Agreement effected the transfer of a computer system and certain furniture from a Debtor Subsidiary to a Central South Company for $39,128. (Settlement Agreement ¶ 10(a)). Intercompany accounts were also resolved. (Settlement Agreement ¶ 11).

Finally, the two sides exchanged releases of claims except those arising out of the Settlement Agreement. Thus, Value Music and the Debtor Subsidiaries released the Central South Shareholders, and they, in turn, released the Debtors. (Settlement Agreement ¶¶ 12, 13). Among other things, the releases extinguished the Debtors' claims against the Central South Shareholders for the $3.6 million understatement of payables arising out of the acquisition agreement.

The Debtors filed their chapter 11 cases on January 27, 2003. By the time the petitions were filed, the Debtors had paid the rent and taxes due in connection with termination of the warehouse lease and the back salary due to Randall Davidson. After filing, the Debtors paid the remaining salary payments due to the Davidsons in accordance with "first day" orders autho-

---

4. As set forth on Schedule 6 of the Settlement Agreement, the Central South Companies assumed obligations to the Defendants as follows: Provident Music Distribution, Inc., $347,391; Word Entertainment, Inc., $225,028; Compendia Media Group Corporation, $85,097; Atlanta International Record Company, Inc., $64,843; Juanita Bynum Ministries, Inc., $48,742; Bookworld Christian, Inc., $41,981; A.R.E. Distribution, $8,595.

rizing payment of employees in the ordinary course of business.

For their part, the Central South Companies proceeded to assume and pay the trade payables to the Defendants and others. The Central South Companies paid approximately $837,000 prior to the chapter 11 filings; the balance was paid postpetition. (Declaration of G. Davidson ¶¶ 30–32). Some of the Defendants were listed as creditors in the bankruptcy case and filed proofs of claim; others did not.

On November 18, 2003, the Court confirmed the Debtors' First Amended Joint Plan of Reorganization (the "Plan")[5] in the jointly administered cases that had been accepted by the class of general unsecured creditors. In general, the Plan provided for the reorganized Debtors to continue in business under their existing management and ownership[6] and for unsecured creditors to receive *pro rata* payments from two sources. First, the reorganized Debtors agreed to pay $1.5 million within six weeks. (Plan § 4.10(b)). Second, the Plan provided for the Creditors' Committee to appoint a creditor representative pursuant to 11 U.S.C. § 1123(b)(3) to pursue prosecution of certain causes of action of the Debtors, including preference actions, for the benefit of unsecured creditors. (Plan §§ 4.01(b), 10.07(c)).

With regard to executory contracts, the Plan provided for the assumption of any that were not rejected. (Plan § 7.01). The Debtors never rejected the Settlement Agreement. Thus, if it is an executory contract, it has been assumed.

## II. DISCUSSION

The Creditor Representative alleges that the assumption and payment by the Central South Companies of $861,486 to the Defendants, instead of payment of that amount of cash to the Debtors for the balance of the inventory purchase price and as damages for breach of the acquisition agreement, constituted transfers of the insolvent Debtors' property to or for the benefit of the Defendants within 90 days of the Debtors' bankruptcy filings. Asserting that the transfers enabled the Defendants to receive more on account of their antecedent debts than they would have received in a chapter 7 liquidation of the Debtors if the transfers had not been made, the Creditor Representative seeks avoidance of the transfers as preferences under 11 U.S.C. § 547 and recovery of them under 11 U.S.C. § 550 for distribution to unsecured creditors in accordance with the Plan.

In their motions for summary judgment, the Defendants advance two arguments to preclude these preference actions. The first is that confirmation of the Plan bars the actions because the terms of the Plan did not sufficiently provide for their prosecution. The second is that, because the payments were made pursuant to the Settlement Agreement that was an executory contract assumed under 11 U.S.C. § 365, preference actions cannot be maintained.

### A. Confirmation of the Plan as Precluding Prosecution of Preference Actions

The Defendants advance two related and somewhat overlapping theories to support

---

5. First Amended Joint Plan of Reorganization for Value Music Concepts, Inc., KAR, Inc., Music 4 Less, Inc., Central–South Music Sales, Inc., and Record Central, Inc., filed October 21, 2003, Case No. 03–61285 [Docket No. 343], *confirmed by* Order entered November 18, 2003 [Docket No. 372].

6. Because the class of unsecured creditors accepted the Plan, the "cram-down" provisions of 11 U.S.C. § 1129(b) were not invoked, and the absolute priority rule did not apply.

their position that confirmation of the Plan bars the preference actions because its provisions for the Creditor Representative to prosecute avoidance actions did not specifically identify these Defendants and these preference actions.

One is the doctrine of *res judicata.* In this regard, some courts have ruled that entry of a confirmation order is *res judicata* as to the postconfirmation prosecution of causes of action unless the plan expressly reserves them.[7] Invoking this principle, the Defendants contend that, because the Plan did not specifically identify them or these actions, the Plan did not expressly reserve these actions and, therefore, *res judicata* bars their prosecution. The second theory is based on the proposition that a plan's provision for the prosecution of causes of action by a creditor representative under 11 U.S.C. § 1123(b)(3) does not permit pursuit of causes of action that the plan does not expressly identify.[8] The Defendants assert that the Plan fails this requirement because, again, it does not specifically identify the potential causes of action and the Defendants.

■ *Res judicata* principles do not govern the issue. The Eleventh Circuit set forth the four requirements for *res judicata*—more appropriately and precisely, claims preclusion—in the context of a chapter 11 confirmation order in *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks*

*II, Ltd.),* 898 F.2d 1544 (11th Cir.1990). The court held that a confirmation order meets the first requirement, that there be a valid order, because it is obviously within the bankruptcy court's jurisdiction, and because due process standards are met if it is entered after a proper hearing in compliance with the procedural requirements of the Federal Rules of Bankruptcy Procedure. Second, a confirmation order meets the requirement of a final judgment on the merits because it has the same effect as a district court's final judgment on the merits. The third requirement, that there must be identity of both parties or their privies, is satisfied if all of the parties in the later litigation were parties in interest entitled to object to confirmation under 11 U.S.C. § 1128.

The fourth requirement, important here, is that "the later proceeding must involve the same cause of action as involved in the earlier proceeding." *Justice Oaks,* 898 F.2d at 1550. The court explained that this requires an examination of whether claims asserted in postconfirmation litigation "were actually made, *or could have been made,* in the objection to confirmation." *Id.* at 1552.

Cases that apply *res judicata* to bar a claim that could have been raised prior to confirmation in the bankruptcy *proceedings* (by which they apparently mean the bankruptcy *case*)[9] are inconsistent with

**7.** *E.g., Browning v. Levy,* 283 F.3d 761, 775 (6th Cir.2002); *D & K Properties Crystal Lake v. Mutual Life Ins. Co. of New York,* 112 F.3d 257, 259–60 (7th Cir.1997); *McFarland v. Leyh (In re Texas Gen. Petroleum Corp.),* 52 F.3d 1330, 1335, n. 4 (5th Cir.1995); *see Fleet National Bank v. Gray (In re Bankvest Capital Corp.),* 375 F.3d 51 (1st Cir.2004).

**8.** *E.g., P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (In re P.A. Bergner & Co.),* 140 F.3d 1111, 1117 (7th Cir.1998); *Retail Marketing Co. v. King (In re Mako, Inc.),* 985 F.2d 1052 (10th Cir.1993). *See generally* Alan N.

Resnick and Henry J. Sommer, 7 COLLIER ON BANKRUPTCY ¶ 1123.02[3][b] (15th ed. rev. 2005).

**9.** *E.g., Browning v. Levy,* 283 F.3d 761 (6th Cir.2002); *Micro–Time Management Systems, Inc. v. Allard & Fish, P.C. (In re Micro–Time Management Systems, Inc.),* 983 F.2d 1067 (6th Cir.1993) (unpublished); *Slone v. M2M International, Inc. (In re G–P Plastics, Inc.),* 320 B.R. 861 (E.D.Mich.2005); *Mickey's Enterprises, Inc. v. Saturday Sales, Inc. (In re Mickey's Enterprises, Inc.),* 165 B.R. 188 (Bankr.W.D.Tex.1994).

the *Justice Oaks* formulation of the fourth requirement and do not take account of what a confirmation order actually resolves. As the Eleventh Circuit noted in *Kaiser Aerospace and Electronics Corp. v. Teledyne Industries, Inc. (In re Piper Aircraft Corp.)*, 244 F.3d 1289, 1300 (11th Cir.2001), the facts relating to the confirmation criteria of 11 U.S.C. § 1129(a) are the only facts *necessarily* put into issue in connection with entry of a confirmation order. *See also The Alary Corp. v. Sims (In re Associated Vintage Group, Inc.)*, 283 B.R. 549, 560–61 (9th Cir. BAP 2002). Thus, the Eleventh Circuit in *Piper Aircraft* limited the preclusive effect of a confirmation order in subsequent litigation to claims involving facts that the bankruptcy court was required by law to consider or actually did consider in confirmation proceedings. Other courts reach the same result.[10]

Even if the Court assumes *arguendo* that the first three requirements for application of *res judicata* have been met here, the fourth one has not been. The preference actions were not litigated in the Debtors' confirmation proceedings, and, because an adversary proceeding is required to avoid a preferential transfer, Fed. R. Bankr.P. 7001(1), they could not have been. *Cf. Universal American Mtg. Co. v. Bateman (In re Bateman)*, 331 F.3d 821,

827–28 (11th Cir.2003). The Court concludes that the confirmation order cannot be *res judicata* as to these adversary proceedings because they do not involve the same issues that were, or could have been, litigated in connection with objections to confirmation of the Plan.

■ Thus, *res judicata* principles have nothing to do with the issue at hand. The proper question is not whether the confirmation order bars prosecution of avoidance actions as a matter of *res judicata* but whether the Plan sufficiently authorizes such litigation in accordance with § 1123(b)(3). In other words, confirmation will bar prosecution of avoidance actions that a plan does not sufficiently identify not because of *res judicata* but because confirmation extinguishes them in the absence of compliance with § 1123(b)(3).[11]

■ Courts have not always observed this distinction. Whether they analyze the issue in terms of *res judicata* or the requirements of § 1123(b)(3), however, the test is the same: The provisions of the plan must sufficiently identify the causes of action to be retained to permit their prosecution.[12]

The courts divide on this question. Some courts require a specific identification of defendants and causes of action in order to permit their postconfirmation prosecution.[13] Other courts hold that a

---

**10.** *E.g., Eastern Minerals & Chemicals Co. v. Mahan*, 225 F.3d 330, 336 n. 11 (3d Cir. 2000); *The Alary Corp. v. Sims (In re Associated Vintage Group, Inc.)*, 283 B.R. 549, 560–62 (9th Cir. BAP 2002); *Cohen v. TIC Financial Systems (In re Ampace Corp.)*, 279 B.R. 145, 154–55 (Bankr.D.Del.2002).

**11.** *See, e.g., Harstad v. First American Bank*, 39 F.3d 898 (8th Cir.1994); *The Elk Horn Coal Co. v. Conveyor Mfg. & Supply, Inc. (In re Pen Holdings, Inc.)*, 316 B.R. 495, 499–500 (Bankr.M.D.Tenn.2004) (noting that predecessor of § 1123(b)(3) in Bankruptcy Act had been added to make it clear that a plan could

provide for postconfirmation litigation of causes of action for the benefit of creditors).

**12.** Another question often litigated in this context—whether the postconfirmation prosecution of retained causes of action must benefit the estate—is not presented here, because unsecured creditors receive all the net proceeds. *See generally* Alan N. Resnick and Henry J. Sommer, 7 Collier on Bankruptcy ¶ 1123.02[3][c] and cases cited at 1122–23, n. 21 (15th ed. rev.2005).

**13.** *E.g., Browning v. Levy*, 283 F.3d 761, 774 (6th Cir.2002); *D & K Properties Crystal Lake*

plan preserves causes of action if it describes them by type or category.[14]

Several recent cases thoroughly consider the issue and persuasively state the reasons why specific identification of defendants or causes of action is not necessary. *Guttman v. Martin (In re Railworks Corp.)*, 325 B.R. 709 (Bankr.D.Md.2005); *The Elk Horn Coal Co., LLC v. Conveyor Mfg. & Supply, Inc. (In re Pen Holdings, Inc.)*, 316 B.R. 495 (Bankr.M.D.Tenn. 2004); *Kmart Corp. v. Intercraft Co. (In re Kmart Corp.)*, 310 B.R. 107 (Bankr. N.D.Ill.2004). *In re Railworks Corp.*, 325 B.R. at 717 (citations and interior quotation omitted), illustrates their reasoning:

> The underlying effect of 11 U.S.C. § 1123(b)(3) is to expedite confirmation and the rehabilitation of the debtor. § 1123(b)(3)(B) serves the useful function of allowing confirmation of a plan before possible claims against others have been fully investigated and pursued. To say confirmation must await a final decision of all possible preference complaints would either inordinately delay confirmation, with all the attendant expense, or result in a windfall in favor of those who received preference transfers. Therefore, the better reasoned approach is one that recognizes that without retention of the ·cause of action, the claim would revert to the debtor, the creditor, or otherwise cease to accrue to the benefit of all creditors in the bankruptcy case. This consequence, in combination with the need to expedite confirmation, cautions toward a more general reservation, rather than one more narrowly tailored, so long as the plan is specific enough to give adequate notice of the reservation to creditors of the debtor's estate.

■■ These authorities, and others cited in footnote 14, properly analyze the issue and reach the correct result. For the reasons they state, the Court concludes that § 1123(b)(3) does not require that a plan specifically identify potential defendants against which causes of action are retained or that it describe specific

v. Mutual Life Ins. Co. of New York, 112 F.3d 257 (7th Cir.1997) (But cf. P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (In re P.A. Bergner & Co.), 140 F.3d 1111 (7th Cir.1998)); Slone v. M2M International, Inc. (In re G–P Plastics, Inc.), 320 B.R. 861 (E.D.Mich.2005); In re A.P. Liquidating Co., 283 B.R. 456, 460 (Bankr.E.D.Mich.2002); Southtrust Bank, N.A. v. WCI Outdoor Products, Inc. (In re Huntsville Small Engines, Inc.), 228 B.R. 9 (Bankr.N.D.Ala.1998); Paramount Plastics, Inc. v. Polymerland, Inc. (In re Paramount Plastics, Inc.), 172 B.R. 331, 335 (Bankr. W.D.Wash.1994); Mickey's Enterprises, Inc. v. Saturday Sales, Inc. (In re Mickey's Enterprises, Inc.), 165 B.R. 188 (Bankr.W.D.Tex.1994); Westland Oil Development Corp. v. MCorp Management Solutions, Inc., 157 B.R. 100, 103 (S.D.Tex.1993); cf. Harstad v. First American Bank, 39 F.3d 898 (8th Cir.1994).

14. E.g., Fleet National Bank v. Gray (In re Bankvest Capital Corp.), 375 F.3d 51, 59–60 (1st Cir.2004); P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (In re P.A. Bergner & Co.), 140 F.3d 1111 (7th Cir.1998) (But cf. D & K Properties Crystal Lake v. Mutual Life Ins. Co. of New York, 112 F.3d 257 (7th Cir.1997)); The Alary Corp. v. Sims (In re Associated Vintage Group, Inc.), 283 B.R. 549, 563–65 (9th Cir. BAP 2002); Cooper v. Tech Data Corp. (In re Bridgeport Holdings, Inc.), 2005 WL 1943535 (Bankr.D.Del. Aug. 12, 2005); Guttman v. Martin (In re Railworks Corp.), 325 B.R. 709, 716–18 (Bankr.D.Md.2005); Connolly v. City of Houston (In re Western Integrated Networks, LLC), 322 B.R. 156 (Bankr. D.Colo.2005); The Elk Horn Coal Company, LLC v. Conveyor Manufacturing & Supply, Inc. (In re Pen Holdings, Inc.), 316 B.R. 495, 504– 05 (Bankr.M.D.Tenn.2004); Kmart Corp. v. Intercraft Co. (In re Kmart Corp.), 310 B.R. 107, 119–26 (Bankr.N.D.Ill.2004); Ringel Valuation Servs., Inc. v. Shamrock Foods Co. (In re Arizona Fast Foods, LLC ), 299 B.R. 589 (Bankr.D.Ariz.2003); Cohen v. TIC Fin. Systems (In re Ampace Corp.), 279 B.R. 145, 156– 63 (Bankr.D.Del.2002).

claims.[15] The Court will thus examine the Plan's provisions to determine whether they sufficiently identified the types or categories of retained causes of action and gave adequate notice of the reservation to creditors.

Section 10.07(c) of the Debtors' Plan provides for the Creditors' Committee to appoint a creditor representative pursuant to 11 U.S.C. § 1123(b)(3) to retain and enforce, for the benefit of unsecured creditors, "Creditor Causes of Action." The section then defines "Creditor Causes of Action" as, among other things, "avoidance actions arising under Chapter 5 of the Bankruptcy Code, which includes, without limitation, actions for the recovery pursuant to Section 550 of the Bankruptcy Code of transfers avoidable by reasons of Sections 544, 545, 547, 548, 549, or 553(b) of the Bankruptcy Code." Section 4.10(b) of the Plan provides that unsecured creditors will receive "a Pro Rata Share of the net recovery made by the Creditor Representative from the Creditor Causes of Action which he or she has been given the authority to pursue pursuant to Section 10.07(c) of the Plan."

These provisions could not be more clear. They specifically state that avoidance actions, including preferences under § 547, are being retained and that their net proceeds will be paid to unsecured creditors.

The disclosure statement provides clear notice to creditors that avoidance actions are being retained for postconfirmation prosecution by the Creditor Representative. (Disclosure Statement [16] pp. 28, 36). Indeed, it is noteworthy that the Creditors'

**15.** The Court rejects the observation made in *Connolly v. City of Houston (In re Western Integrated Networks, LLC)*, 322 B.R. 156, 161 (Bankr.D.Colo.2005), that there is a "growing trend" in cases that suggests that "the failure of a plan to identify *defendant* and *claim-specific* actions which could be brought post-confirmation by the reorganized debtor or its successor-in-interest prohibits any attempt to assert post-confirmation claims." That court's perception of a "trend" was based on the Sixth Circuit's decision in *Browning v. Levy*, 283 F.3d 761, 774–75 (6th Cir.2002); a decision of a district court in the Sixth Circuit following it, *Slone v. M2M International, Inc. (In re G–P Plastics, Inc.)*, 320 B.R. 861 (E.D.Mich.2005); and a bankruptcy court decision that does not deal with the issue, *Michaels v. World Color Press, Inc. (In re LGI, Inc.)*, 322 B.R. 95 (Bankr.D.N.J.2005). Finding a trend from these cases is questionable in view of at least one later circuit court decision finding categorical reservation to be sufficient, *Fleet National Bank v. Gray (In re Bankvest Capital Corp.)*, 375 F.3d 51 (1st Cir. 2004), and at least four published bankruptcy court decisions (decided after *Browning* but before *Western Integrated Networks*) to the same effect. *The Elk Horn Coal Company, LLC v. Conveyor Manufacturing & Supply, Inc. (In re Pen Holdings, Inc.)*, 316 B.R. 495, 504–05 (Bankr.M.D.Tenn.2004); *Kmart Corp. v. Intercraft Co. (In re Kmart Corp.)*, 310 B.R. 107, 119–26 (Bankr.N.D.Ill.2004); *Ringel Valuation Servs., Inc. v. Shamrock Foods Co. (In re Arizona Fast Foods, LLC)*, 299 B.R. 589 (Bankr.D.Ariz.2003); *Cohen v. TIC Fin. Systems (In re Ampace Corp.)*, 279 B.R. 145, 156–63 (Bankr.D.Del.2002). Further evidence contrary to the "trend" is the recent bankruptcy court decision quoted in the text, *Guttman v. Martin (In re Railworks Corp.)*, 325 B.R. 709, 716–18 (Bankr.D.Md.2005).

In any event, this Court's observation is that the cases requiring specific identification of causes of action and defendants are not a new trend but a departure from the fundamentally sound approach exemplified by the cases just mentioned and others cited in footnote 14. In this Court's view, the ruling here sets forth the law as it has been, and is being, routinely followed by the bench and bar in hundreds of chapter 11 cases in which plans, identical in concept, purpose, and effect to the one here, have been confirmed. *See Cooper v. Tech Data Corp. (In re Bridgeport Holdings, Inc.)*, 2005 WL 1943535 at *12 (Bankr. D.Del. Aug. 12, 2005).

**16.** Disclosure Statement for First Amended Joint Plan of Reorganization, Case No. 03–61285, filed October 21, 2003 [Docket No. 344].

Committee—the representative of creditor interests in the chapter 11 statutory scheme—had responsibility for selection of the Creditor Representative, thereby demonstrating that the creditor body was fully aware that avoidance actions would be pursued. (Plan § 10.07(c)).

The Defendants complain that the disclosure statement does not quantify estimated recoveries on preference actions or account for them in its chapter 7 liquidation analysis. But this is immaterial to the issue.

The Plan in these cases was designed to extricate the business assets and ongoing operations of the reorganized Debtors from the bankruptcy cases as soon as possible while permitting creditors to receive the benefit of the prosecution of avoidance actions that would necessarily take time to litigate. As is common in cases like this, the Debtors had not investigated potential avoidance actions because they expected the Creditors' Committee and the Creditor Representative to do so. (Thomas Thirkell Affidavit, ¶ 20).

The important question for creditors to determine in considering the Debtors' Plan was whether the Debtors' payment of $1.5 million for their benefit was as much (or more) as they would likely receive from the liquidation of assets in chapter 7 cases. Avoidance actions *would be prosecuted in any event* under both the Plan and in chapter 7 cases. Consequently, their inclusion in the chapter 7 liquidation analysis was irrelevant because they also were not included in the projection of results under the Plan. An analysis of avoidance actions must be included in a chapter 7 liquidation analysis only if they are also included in a projection of the chapter 11 result. Because the Debtors had not investigated the avoidance actions, they obviously were not

in a position to project the amount to be added to the estimated recovery under both chapter 7 liquidation and chapter 11 reorganization scenarios. The absence of a preconfirmation preference analysis that has nothing to do with consideration of the Plan by creditors or confirmation by the Court does not prevent prosecution of these preference actions.

It is likewise immaterial that the Debtors stated in the liquidation analysis attached as an appendix to the disclosure statement that they had not included a preference analysis because they believed that "any recovery of preferences would have a negligible effect on the unsecured creditors in a Chapter 7." (Appendix C to Disclosure Statement).[17] Although the Debtors could have phrased this particular observation more artfully, or not made it at all, the sentence does not detract from the clear message of the Plan and disclosure statement that a creditor representative will investigate and pursue preference actions.

The following things are obvious from the Plan and disclosure statement taken as a whole and from the context of the cases, particularly the involvement of the Creditors' Committee in the Plan and confirmation process: The Debtors had not done a preference analysis; a preference analysis could not have affected consideration of the key issue, *i.e.*, comparison of projected recoveries under the Plan to those under chapter 7 liquidation; the Debtors had no interest in, and could never benefit from, preference recoveries and had no reason to care about them (other than, perhaps, to accede to the Creditors' Committee's position that they should be prosecuted); any reasonably informed creditor would learn from express provisions of the Plan and disclosure statement that the Creditors'

17. Plaintiffs' Consolidated Response (Adv. No. 04–06207) [Docket No. 30], Exhibit B.

Committee, whose constituency *does* have an obvious interest in preference actions, intended that a creditor representative it selected *would* investigate and prosecute preference claims.

■ The provisions of the Plan and disclosure statement obviously satisfied the Creditors' Committee, which had the duty to represent the interests of unsecured creditors with regard to the Plan, which knew that it would select a creditor representative to pursue preferences, and which did not object to confirmation or the disclosure statement. There was fair, if not perfect, notice to creditors that preferences would be investigated and prosecuted. Furthermore, § 1123(b)(3)'s requirements are for the protection of creditors, not potential preference defendants.[18]

Given the overwhelming acceptance of the Plan by unsecured creditors, there is absolutely nothing in this record to support the proposition that the Debtors downplayed the prospect of preference recoveries to discourage objections to confirmation or to obtain any benefit for themselves. In any event, what the admittedly uninformed Debtors thought about the prospects for preference litigation properly has no bearing on the interests of unsecured creditors under the Plan to have their recoveries enhanced by preference recoveries pursued by their representative.

For all of the foregoing reasons, the Court concludes that the Plan sufficiently identified and therefore retained preference actions for prosecution by the Creditor Representative under § 1123(b)(3). Consequently, the Creditor Representative

is authorized to bring these actions against the Defendants for the benefit of the Debtors' unsecured creditors.

## B. The Settlement Agreement as an Executory Contract

The Defendants other than New Day contend that the Settlement Agreement was an assumed executory contract, that the alleged transfers to them were made pursuant thereto, and that, therefore, they are not avoidable on the principle (disputed by the Creditor Representative in its application here) that payments made under an executory contract assumed under § 365 cannot be avoided as preferential transfers.[19] For reasons set forth below, the Court concludes that the Settlement Agreement was not an executory contract. Because the premise of the argument fails, the Court need not address the balance of this argument.

■ An executory contract for purposes of 11 U.S.C. § 365 is a "contract under which the obligation of both the [debtor] and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Gencor Industries, Inc. v. CMI Terex Corp. (In re Gencor Industries, Inc.)*, 298 B.R. 902, 909 (Bankr.M.D.Fla.2003) (quoting Vern Countryman, *Executory Contracts in Bankruptcy*, 57 MINN. L.REV. 439, 460 (1973)). Under this rule, a contract is not executory unless both parties have unperformed obligations that would constitute a material breach if not performed. *Id.* (citing *In*

---

18. *E.g., Harstad v. First American Bank*, 39 F.3d 898, 902 (8th Cir.1994); *The Elk Horn Coal Co. v. Conveyor Mfg. & Supply, Inc. (In re Pen Holdings, Inc.)*, 316 B.R. 495, 500–01 (Bankr.M.D.Tenn.2004); *Kmart Corp. v. Intercraft Co. (In re Kmart Corp.)*, 310 B.R. 107, 120 (Bankr.N.D.Ill.2004).

19. *See, e.g., Kimmelman v. The Port Authority of N.Y. and N.J. (In re Kiwi Int'l Air Lines, Inc.)*, 344 F.3d 311 (3d Cir.2003); *In re Superior Toy & Mfg., Co., Inc.*, 78 F.3d 1169 (7th Cir.1996).

*re Columbia Gas Sys., Inc.,* 50 F.3d 233, 239 (3d Cir.1995)). Whether a contract is executory is determined at the time of assumption or rejection that, in this case, is the date of confirmation.[20]

 Viewed broadly, the Settlement Agreement effected a business divorce between two recently married groups of companies, settling disputes and dividing up assets. Any future performance to implement its provisions was to take place within a short time frame, and the Settlement Agreement did not contemplate any significant ongoing business relationships among the parties of the type that are typically present when a contract is found to be executory. Moreover, for the most part, the only future performance contemplated by the Settlement Agreement was the payment of money. Ordinarily, an obligation to pay money under a contract does not render it executory. *E.g., Gencor Industries, Inc.,* 298 B.R. at 911 (citing *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043 (4th Cir.1985)). These considerations clearly indicate that the contract was not executory.

More specifically, the Debtors had no material unperformed obligations. In this regard, the Defendants identify the Debtors' unperformed obligations under the Settlement Agreement as of the petition date as being the obligations to pay postpetition salaries to the Davidsons, to perform under the warehouse lease, and to perform under the aircraft lease. Examination of the terms and performance of these provisions demonstrate that none of them involved unperformed obligations that render the Settlement Agreement executory.

The Debtors paid the Davidsons within weeks after the bankruptcy filings in accordance with the Settlement Agreement. This performance obviously eliminates the contention that the Debtors had an unperformed obligation to the Davidsons as of the confirmation date, the relevant time. Even if determination of whether a contract is executory must be based on unperformed obligations as of the petition date, however, the Debtors' obligations for salaries were nothing more than the obligation to pay money in view of the obvious fact that no significant work was expected from the Davidsons, whose employment was being terminated. The Debtors' failure to pay might have excused the Davidsons from performing services. But this is immaterial because the Debtors neither wanted nor expected their services.

The Debtors had likewise satisfied all their monetary obligations under the warehouse lease, as modified by the Settlement Agreement, before filing the petitions. Their only remaining postpetition obligation was to surrender the premises, which was to take place within four days after the filing. This was not a material unperformed obligation. Moreover, the Settlement Agreement did not govern the Debtors' obligations under the warehouse lease. Because the Settlement Agreement merely modified the existing lease, any postpetition lease obligation of the Debtors arose under the lease agreement, not the Settlement Agreement, which was fully executed in this regard when it was signed.

Similarly, the Debtors did not have material unperformed obligations under provisions of the Settlement Agreement relating to the aircraft lease. The context of

---

**20.** *E.g., Gloria Mfg. Corp. v. International Ladies' Garment Workers' Union,* 734 F.2d 1020, 1022 (4th Cir.1984); *In re Penn Traffic Co.,* 322 B.R. 63 (Bankr.S.D.N.Y.2005); *In re* *Wang Laboratories, Inc.,* 154 B.R. 389, 391 (Bankr.D.Mass.1993); *In re Government Securities Corp.,* 101 B.R. 343, 349 (Bankr.S.D.Fla. 1989).

the transactions and the record in the main case[21] show that the aircraft had been owned by a Debtor Subsidiary prior to the acquisition transaction and that it was then, and remained, subject to a security interest in favor of SouthTrust Bank. The day before Value Music acquired the Debtor Subsidiaries, the soon to be acquired company leased the aircraft to the Central South Companies. Presumably, this lease provided that the Central South Companies would pay rent to the Debtors, who would make payments to SouthTrust on the secured loan. The Settlement Agreement modified the aircraft lease to provide for rent of $1.00 per month and for the Central South Companies to make payments directly to SouthTrust as additional rent. In all other respects, the terms of the aircraft lease remained in full force and effect.

The Settlement Agreement itself imposed no obligation on the Debtors to perform under the aircraft lease; it simply modified one of its provisions, leaving all other terms and conditions in full force and effect. Thus, it is clear that the parties intended for their future relationships with regard to the aircraft to be governed under the aircraft lease, not the Settlement Agreement. Consequently, any failure of the Debtors to perform under the aircraft lease would be a breach of the lease, not the Settlement Agreement. In short, this provision of the Settlement Agreement was performed the instant the ink was dry.[22]

Because the Debtors had no material unperformed obligations under the Settlement Agreement as of the date of confirmation (or even as of the date of filing the petitions), it was not an executory contract. The Defendants are not entitled to summary judgment on the ground that its assumption bars the Creditor Representative's preference actions.

### III. Conclusion

For reasons set forth above, the Defendants' motions for summary judgment are **DENIED.**

---

21. Case No. 03–61285, Motion for Relief from Stay filed August 22, 2003, by SouthTrust Bank, Docket No. 292.

22. Moreover, it appears from the record in the main case that the stay was terminated to permit SouthTrust Bank to foreclose and sell the aircraft. Case No. 03–61285, Motion for Relief from Stay filed August 22, 2003 by SouthTrust Bank [Docket No. 292] and Order lifting stay entered September 2, 2003 [Docket No. 301]. Presumably the foreclosure came about because the Central South Companies defaulted under their obligations to pay SouthTrust Bank.